NATIONAL STEEL & SHIPBUILDING
CO. and Fireman's Fund American
Insurance Co., Petitioners,

v.

Emma J. (Evans) BONNER and U. S.
Dept. of Labor, Respondents.

No. 77–1584.

United States Court of Appeals,
Ninth Circuit.

July 17, 1979.

---

William H. Taylor, San Diego, Cal., for petitioners.

Laurie M. Streeter, Asso. Sol., U. S. Dept. of Labor, NDOL, Washington, D. C., Mary A. Sheehan, Washington, D. C., Donald W. Zellman, Brundage, Williams & Zellman, San Diego, Cal., for respondents.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and GRAY *, District Judge.

* The Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

GOODWIN, Circuit Judge:

National Steel & Shipbuilding Co. appeals an award of disability benefits to its employee, Emma Bonner, under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.*

The Benefits Review Board of the Department of Labor (BRB) affirmed an administrative law judge's determination that Bonner's average weekly wages were $189.93. It also affirmed an assessment by the ALJ of 10 percent of the difference between the amount of benefits voluntarily paid to Bonner before the award and the amount of the award.

## I.

Bonner, a pipefitter-helper for National Steel, injured her back while on the job on May 15, 1973. She left work the next day because of the injury, and has been unable to work since. Shortly after the injury, National Steel began paying Bonner disability benefits, at the rate of $118.94 per week. The Longshoremen's and Harbor Workers' Compensation Act sets the level of weekly benefits for temporary total disability, such as Bonner's, at 66⅔ percent of the average weekly wage of the employee. 33 U.S.C. § 908(a)–(b). Thus, the early payments from National Steel were based on an average weekly wage of $178.41.

A week before the first anniversary of the accident, the employer reduced the disability payments to $70 per week. No statement by the employer explaining the reasons for this cutback appears in the record.[1] Bonner promptly filed an informal claim for compensation with the Department of Labor. On March 25, 1975, the parties and an assistant deputy commissioner of the department held a conference. The assistant deputy commissioner concluded that the old rate of compensation—$118.94 per week—should be resumed. The employer refused to resume the $118.94 payments.

Bonner then filed for a formal hearing on her claim for higher payments. At that hearing, she sought disability benefits of $167 per week, the maximum allowed under the statute. She also asked the ALJ to assess an additional 10 percent of the difference between what she had been paid and what she was owed, under 33 U.S.C. § 914(e). The employer and its insurer contended that her average weekly wage was even lower than $178.41, and thus that their early voluntary payments had been too high. They also protested the proposed 10 percent assessment.

The ALJ held that the employee's average weekly wage was $189.93, warranting a compensation rate of $126.68. This rate was $7.74 higher than the company's first weekly payments, and $56.68 a week higher than its payments since May 9, 1974. The ALJ also assessed the additional 10 percent payment under 33 U.S.C. § 914(e). The company and its insurer appealed to the BRB, which affirmed.

## II.

We begin our analysis by noting jurisdiction. The employee-claimant urges us not to exercise jurisdiction over this appeal. We have power to review the case and controversy pursuant to 33 U.S.C. § 921(c), which provides in relevant part:

"Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court, to the Board, and to the other parties, and thereupon the Board shall file in the court the record in the proceedings as provided in section 2112 of Title 28. Upon such filing, the court shall have jurisdiction of the pro-

---

1. Nothing turns on the point, but apparently the employer's review of the file prompted a unilateral decision by the employer to treat the worker's condition as "stationary" and to fix compensation at "permanent partial" rates.

ceeding and shall have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the Board and enforcing same to the extent that such order is affirmed or modified. The orders, writs, and processes of the court in such proceedings may run, be served, and be returnable anywhere in the United States * * *."

The employee asks this court to decline to review the BRB decision because, she claims, the appeal to the BRB of the ALJ's findings did not raise "a substantial question of law or fact", as required by 33 U.S.C. § 921(b)(3). This section provides in relevant part:

"The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter and the extensions thereof *   *."

This court's jurisdiction under section 921(c) appears to be mandatory: "Any person * * * aggrieved by a final order of the Board may obtain a review * * *." If the BRB improperly heard the case, then the proper course for this court would be to vacate the Board's order. However, we defer to the BRB's implicit indication that the questions posed to it were "substantial". And even if we were to look more closely at the Board's decision that it had jurisdiction, we would affirm that decision. As will be seen, the issues in this case are complex. The case is full of substantial questions of statutory construction.

### III.

Calculation of weekly compensation rates under the Longshoremen's and Harbor Workers' Compensation Act is a three-step process. First, the employee's *average annual earnings* are computed pursuant to one of three subsections of 33 U.S.C. § 910: subsection (a), (b), or (c). These average annual earnings are divided by 52 to arrive at the employee's *average weekly wages*. 33 U.S.C. § 910(d). Two thirds of the weekly wages is the weekly rate of compensation for total disability. 33 U.S.C. § 908(a)–(b).

The ALJ's findings on Bonner's average weekly wages consisted of just two paragraphs, as follows:

"9. Claimant's average weekly wage at the time of the injury was $189.93.

"Claimant's work record shows that she worked substantially less than the claimed 40 hours a week with 10 hours overtime. In the 10 weeks of employment, between the probationary period and the injury, Claimant earned an average of $189.93 per week, including overtime. To include the probationary period when overtime was not available would not fairly reflect Claimant's average weekly wage at the time of the injury."

■ This finding did not specify under which subsection of 33 U.S.C. § 910 the average annual earnings of the employee were computed, but the BRB concluded that the subsection the ALJ used was 33 U.S.C. § 910(c), which provides in relevant part:

"[A]verage annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the service of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee."

This subsection is applied to intermittent and irregular employment, when application of the mathematical formulas of section 910(a) or (b) would be unreasonable and unfair. See *California Ship Service Co. v. Pillsbury*, 175 F.2d 873 (9th Cir. 1949); *Fireman's Fund Insurance Co. v. Peterson*, 120 F.2d 547 (9th Cir. 1941). It is also properly used when insufficient evidence is presented at the hearing to permit proper application of section 910(a) or (b). See *Todd Shipyards Corp. v. Director, Office of*

*Worker's Compensation Programs,* 545 F.2d 1176, 1179 (9th Cir. 1976).

No one argues that section 910(c) should not have been applied to this case. The employer and its insurance carrier contend, however, that the ALJ misapplied section 910(c). They point to a substantial body of evidence presented on Bonner's prior employment elsewhere that they say compels a smaller award. They assert that under section 910(c) the ALJ must pay "regard to" the employee's past earnings in work other than that at which the employee was injured.

At the time of her injury, Bonner had worked for National Steel for about 13 weeks, beginning on February 13, 1973. Records in evidence show that she earned $2,461.89 in that period, for an average of about $189 per week. Prior to joining National Steel, she had worked about six months, from early June to December 1972, as a sandblaster at Rubber Teck, a rubber-products manufacturer. There she had earned between $1.95 and $2.00 per hour, which on the basis of a 40-hour workweek totals between $78 and $80 per week. From early December 1971 to early June 1972, she had worked as a barmaid, earning $2.00 an hour. On the basis of a 48-hour workweek, this came to $96 a week. Prior to December 1971, she had been a babysitter and housekeeper.

In determining earning capacity under section 910(c), the actual wages earned by the employee are not controlling. *Gunther v. United States Employees' Compensation Commission,* 41 F.2d 151 (9th Cir. 1930). And in reviewing rulings of the BRB, which affirmed the ALJ here, this court generally must defer to the Board both in its fact-finding capacity (*O'Leary v. Brown-Pacific-Maxon, Inc.,* 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951)) and in its role as interpreter of the Act (*see Smith v. Califano,* 597 F.2d 152 at 156 (9th Cir., 1979); *Hart v. McLucas,* 535 F.2d 516, 520 (9th Cir. 1976)).

The Administrative Procedure Act provides for reversal of agencies such as the BRB whenever their rulings are "not in accordance with law", 5 U.S.C. § 706. In *Fireman's Fund Insurance Co. v. Peterson, supra,* this court affirmed a judgment of a district court setting aside an award computed under section 910(c) as "not in accordance with law". Section 910(c) as it was then written required the deputy commissioner to give "regard to" the previous earnings of the injured employee, *and* that of similar employees of the same class in the same locality. There was no evidence on the record of any similar employees' earnings, and the deputy commissioner made his award solely on the basis of what the injured employee had earned as a longshoreman (apparently the method used by the ALJ in this case). The court held that such an award was contrary to law since the deputy commissioner did not consider both factors set out in what was then 33 U.S.C. § 910(c).

In a companion case, *Fireman's Fund Insurance Co. v. Van Steene,* 120 F.2d 548 (9th Cir. 1941), the court highlighted the other side of the coin: mere *consideration* of the two factors is enough to withstand appellate review. If the factfinder actually chose to give little or no *weight* to one of the two factors, the court said, that decision would not be reversed so long as both were considered. In *Van Steene,* there was evidence on the record to show the earnings of other longshoremen; thus, this court reversed a district court judgment setting aside the award.

Section 910(c) as it appears today is somewhat ambiguous as to what the factfinder must consider: it says regard must be given to (1) the previous earnings of the injured employee in the job at which the employee was injured, *and* (2) previous earnings of similar employees, *or* (3) other employment of the injured employee. It is unclear whether (3) alone would be sufficient; perhaps Congress intended that (1) must be combined with either (2) or (3). We need not resolve that question here, for in this case there was evidence before the ALJ of (1) and (3), and nothing in the record shows that the ALJ did not consider them both.

The employer is wrong if it asserts that the ALJ automatically had to base the compensation award upon the minimum wages the employee had earned in her earlier employment. The earlier wages could be considered for what they were worth, but they are not binding upon the ALJ. It is not unusual for a student or apprentice to work at relatively low pay for a period before beginning a job that commands much higher wages. The trier can reasonably draw an inference that but for the injury, the worker would have continued to earn the new, higher wages. It would make no sense to hold as a matter of law that, because this pipefitter was hurt shortly after she started her new job, the employer is entitled to base her disability compensation on her old babysitting wages. We affirm the administrative award.

### IV.

The employer and its insurer also object to the ALJ's imposing on them a 10 percent assessment under 33 U.S.C. § 914(e) for failure to comply with the notice requirement of 33 U.S.C. § 914(d). The two subsections are as follows:

"*(d) Right to compensation controverted.*

"If the employer controverts the right to compensation he shall file with the deputy commissioner on or before the fourteenth day after he has knowledge of the alleged injury or death, a notice, in accordance with a form prescribed by the Secretary, stating that the right to compensation is controverted, the name of the claimant, the name of the employer, the date of the alleged injury or death, and the grounds upon which the right to compensation is controverted.

"*(e) Additional compensation for overdue installment payments payable without award.*

"If any installment of compensation payable without an award is not paid within fourteen days after it becomes due, as provided in subdivision (b) of this section, there shall be added to such unpaid installment an amount equal to 10 per centum thereof, which shall be paid at the same time as, but in addition to, such installment, unless notice is filed under subdivision (d) of this section, or unless such nonpayment is excused by the deputy commissioner after a showing by the employer that owing to conditions over which he had no control such installment could not be paid within the period prescribed for the payment."

According to National Steel, the 10 percent was improperly imposed because the notice requirement of subsection (d) refers only to controversion of "the right to compensation", not to the amount thereof. Because the employer agreed that it owed Bonner some compensation and voluntarily began payment of some compensation to her, it contends it need not have complied with subsection (d), and therefore is not liable under subsection (e) for the 10 percent assessment for noncompliance.

National Steel also notes that at the time notice of controversion was due—"the fourteenth day after [the employer] has knowledge of the alleged injury or death"—there was no controversy between it and Bonner under the Act, and thus nothing about which to give notice.

Whatever the utility of the notice-and-10-percent scheme may have been when Congress passed the Act in 1927, its application to modern compensation case histories is obscure. Indeed, the BRB has been struggling in recent years to define precisely what its policy should be. Until recently, however, the BRB's positions on some issues regarding the section 914(e) assessment were consistent. It was clear, for example, that the assessment applied to underpayment as well as nonpayment. The BRB also routinely assessed 10 percent of the entire difference between what an employee received before an award and what he or she was ultimately awarded. *E. g., Alston v. United Brands,* BRB No. 76–296, 5 BRBS 600, 606–07 (1977); *Caramagna v. Campbell Machine, Inc.,* BRB No. 75–115, 1 BRBS 446 (1975).

This pro-claimant interpretation of the Act was offset at least in part by a Board decision that no extra 10 percent could be

imposed on an employer who filed a notice within 14 days after terminating voluntary payments, although later than the 14 days after knowledge of injury or death granted by section 914(d). *Berger v. Cork 'N' Bottle*, BRB No. 75–240, 4 BRBS 339 (1976). But although *Berger* stretched the statute's language concerning the date of notice, the Board nonetheless clung to its all-or-nothing measure of the assessment when notice was not given. As evidenced by its decision in the case now before us, the Board continued to compute the assessment on the basis of the entire amount underpaid between injury and award, not just the underpayment between the time a controversy arose and the time the parties and the Department knew of the dispute underlying the underpayment.

More recently, the BRB appears to have changed its policy in at least some respects. In *Oho v. Castle and Cooke Terminals, Ltd.*, BRB Nos. 78–128 & 78–128A, 9 BRBS 989 (1979), a 2-to-1 decision, the Board ruled that the 10 percent assessment applied only to payments not made from the time the employer learned of the injury until the time it finally filed a notice. The Board explicitly overruled prior decisions in which it had held that the assessment was based on all payments not made between the time of injury and the time of award.

In *Oho*, the Board noted that its new interpretation of the act is fully consistent with congressional policies. It relied heavily on the notion that the notice of controversion serves to begin the administrative proceedings; that once the Department is notified of a dispute, this purpose is served, and the employer should not be penalized further for failure to file.[2]

Not only did the Board reject the all-or-nothing measure of the amount to which the 10 percent is attached, but *Oho* also discarded the idea that the assessment was not truly a penalty, but rather compensatory. In earlier cases, the Board had ex-

plained that the 10 percent extra payment compensated the injured employee for the inability to use the amount underpaid in the period prior to the award. In *Watkins v. Newport News Shipbuilding & Dry Dock Co.*, BRB No. 78–237, 8 BRBS 556, 559–60 (1978), it has said that the 10 percent makes up for the "inconvenience and expense" an employee may have to undergo in finding other sources of income. *Oho* noted that this could not have been Congress' purpose, because the section 914(e) assessment would fail to fulfill it: an employer can escape the added liability to the employee merely by filing a form, no matter how much the employee is inconvenienced. And the employee is at least partially compensated for the time value of the money owed by the imposition of a 6 percent interest charge, which the Board routinely tacks onto all overdue amounts, apparently without regard to whether a notice of controversion was filed. *See, e. g., Newport News Shipbuilding and Dry Dock Co. v. Graham*, 573 F.2d 167, 171 (4th Cir. 1978).

We believe *Berger* and *Oho* provide the best guidance in these cases. The statute's ambiguity for modern administrative proceedings can be resolved by construing it in light of Congress' apparent intent. In a situation in which a controversy arises soon after an injury, Congress clearly desired that the employer file notice with the Department in order that administrative proceedings might begin. Logic dictates, however, that when there is no controversy at the outset of the claim period, an employer cannot be required to file a notice of controversion until it has reason to believe that a controversy will develop. Termination or reduction of voluntary benefits by the unilateral act of the employer carries with that act reason to believe a controversy will arise. Employer termination or reduction of benefits ought to trigger the notice requirement, regardless of the presence or absence of employee protests. In

---

**2.** Respondents seek to distinguish *Oho* on the ground that there a notice was eventually filed, whereas here no notice was filed. In light of the Board's reliance in *Oho* on the function of the notice as a trigger to departmental action, we view this difference as immaterial once the Department takes action.

other cases, however, notice cannot be required until the employer has reason to believe that a controversy has arisen or will arise. Once an employer has reason to know of a dispute, it must file the notice within 14 days. If it does not, it is liable for the section 914(e) payment, but as *Oho* points out, the assessment should be computed only on the basis of amounts not paid between the time the employer had reason to know the controversy would arise and the time a proper notice was filed, or the Department knew of the facts a proper notice would have revealed.[3] Here, the employer first had reason to know a controversy existed on May 9, 1974, when it reduced disability benefits to $70 per week. It filed no notice of controversion by May 23, 1974. Thus, it must pay Bonner, in addition to the regular disability benefits, 10 percent of the amount underpaid between May 9, 1974, and the day the Department received notice of the facts that a proper notice of controversion would have revealed. Although it is clear that the Department knew these facts by March 25, 1975, the date of the informal conference, the record does not reveal if it had notice of them at an earlier date. Hence a remand for further factfinding is necessary.

Each party shall bear its own costs on this appeal. Bonner has requested attorney's fees on this appeal under 33 U.S.C. § 928(b). The statute allows attorney's fees to a claimant who is successful in review proceedings. In this case the claimant was partially successful, but the employer was also partially successful. This court will retain jurisdiction to fix attorney's fees following the conclusion of the case on remand. Counsel for the claimant should be guided at that time by the procedure outlined in *Ayers Steamship Co. v. Bryant,* 544 F.2d 812, 814 (5th Cir. 1977).

Affirmed in part, reversed in part, and remanded.

**3.** We realize that our holding today may be in conflict with *Universal Terminal & Stevedoring Corp. v. Parker,* 587 F.2d 608 (3d Cir. 1978). *Universal Terminal* was decided before *Oho,* and in it, the Third Circuit rejected the reasoning of *Berger.* We think the better approach is to respect the present interpretation of the BRB, as evidenced by those decisions, to the extent it is consistent with Congress's apparent intent in enacting section 914(e). *See Smith v. Califano,* 597 F.2d 152 at 156 (9th Cir., 1979); *Hart v. McLucas,* 535 F.2d 516, 520 (9th Cir. 1976).