686 F.2d 1336
 1984 A.M.C. 1519
 DUNCANSON-HARRELSON COMPANY and Employers Mutual Liability
Insurance Company of Wausau, Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Respondent,
and
Nancy A. Freer, Claimant.
Nancy A. FREER, Petitioner,
v.
UNITED STATES DEPARTMENT OF LABOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, Respondent.
 Nos. 79-7093, 79-7094.
 United States Court of Appeals,
Ninth Circuit.
 Argued Dec. 10, 1980.
Submitted April 6, 1982.
Decided Sept. 14, 1982.
 
 B. James Finnegan, San Francisco, Cal., argued, for Duncanson-Harrelson Co., et al.; Kiernan & Finnegan, San Francisco, Cal., on brief.
 Lee H. Cliff, San Francisco, Cal., argued, for Freer; W. Martin Tellegen, Hall, Henry, Oliver & McReavy, San Francisco, Cal., on brief.
 Mark C. Walters, Washington, D.C., for Director; Mary A. Sheehan, Washington, D.C., on brief.
 Petition to Review a Decision of the Benefits Review Board United States Department of Labor.
 Before TRASK and ANDERSON, Circuit Judges, and STEPHENS,* district judge.
 TRASK, Circuit Judge:
 
 
 1
 Claimant Freer challenges the amount of compensation awarded her under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 (1976) (Act or LHWCA), by the Benefits Review Board (BRB). Freer's husband (the decedent) was employed as a pile driver and was killed over navigable waters while cutting pilings for the construction of a pier. Freer asserts that the Administrative Law Judge (ALJ) and the BRB erred in determining the amount of compensation by applying the wrong subsection of 33 U.S.C. § 910 and by failing to include employer contributions to the union pension and health funds as part of decedent's wages.
 
 
 2
 Defendants Duncanson-Harrelson Company and its liability insurer (collectively D-H) also appeal urging that the decedent was not covered by the Act. D-H argues alternatively that decedent did not meet the Act's test of coverage or that he belonged to a class of employees specifically excluded.
 
 I. FACTS
 
 3
 David W. Freer, the decedent, was killed while working as a pile butt or pile driver on the expansion of the oil tanker docking facilities operated by Pacific Gas & Electric Company in Pittsburg, California. The dock extends into Suisun Bay, a body of navigable water, and D-H was expanding the facilities at the Pittsburg dock to accommodate a rising volume of fuel oil deliveries. Decedent was employed by D-H and was fatally injured when the top of a dolphin piling he was cutting fell on him. The dolphin was located in 35 feet of water, approximately 25 feet from the nearest dock.[1]
 
 
 4
 Decedent's wife was awarded death benefits by the ALJ who found that the decedent was killed over navigable waters, that he was engaged in maritime employment and was therefore an employee within section 2(3) of the Act. The ALJ also found that decedent was not a member of the crew of the crane barge on which he worked. The ALJ applied section 10(c) of the Act to determine decedent's average weekly wage in the amount of $368.64.
 
 
 5
 Both D-H and the claimant appealed the decision of the ALJ to the BRB. D-H challenged the findings that decedent was engaged in maritime employment and that he was not a member of the crew of a vessel. The claimant sought review of the average weekly wage computation arguing that the ALJ erred in applying section 10(c) rather than section 10(a) of the Act in determining the amount. Claimant also urged that the ALJ erred in failing to include certain fringe benefits in the computation of decedent's earnings. The BRB affirmed the decision of the ALJ. The parties press the same arguments in their appeal to this court.
 
 II. STANDARD OF REVIEW
 
 6
 The Findings of Fact of the ALJ are reviewed by the BRB under the "substantial evidence" standard. 33 U.S.C. § 921(b)(3). The courts have held that the BRB must accept the ALJ's determinations unless they are contrary to the law, irrational, or unsupported by substantial evidence. E.g., Director (OWCP) v. Campbell Industries, 678 F.2d 836, 838 (9th Cir. 1982). We must review BRB decisions for " 'errors of law and for adherence to the statutory standard governing the Board's review of the administrative law judge's factual determinations.' " Id., citing Bumble Bee Sea Foods v. Director (OWCP), 629 F.2d 1327, 1329 (9th Cir. 1980). In Duncanson-Harrelson Co. v. Director (OWCP), 644 F.2d 827, 830 (9th Cir. 1981), this court indicated that the BRB's determinations should be given deference since an administrative agency's interpretation of the statute which it administers is deserving of considerable respect. 644 F.2d at 830. See, e.g., E. I. duPont de Nemours & Co. v. Collins, 432 U.S. 46, 56-57, 97 S.Ct. 2229, 2235, 53 L.Ed.2d 100 (1977), quoting, S.E.C. v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 1583, 91 L.Ed. 1995 (1947). The Supreme Court, however, has noted that because the BRB does not make policy, its interpretations of the LHWCA are not entitled to any special deference. Potomac Electric Power Co. v. Director (OWCP), 449 U.S. 268, 278 n.18, 101 S.Ct. 509, 514 n.18, 66 L.Ed.2d 446 (1980).
 
 III. COVERAGE OF DECEDENT UNDER THE ACT
 A. Maritime Employment
 
 7
 Before the 1972 amendments to the Act, a single geographic test (the "situs" requirement) governed coverage. An employee was entitled to benefits if he was injured while working on or over navigable waters of the United States, even though his occupation was not "maritime." P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 72, 100 S.Ct. 328, 331, 62 L.Ed.2d 225 (1979). There was also a requirement that the worker's employer have at least one employee, not necessarily the injured one, engaged in maritime employment. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 264, 97 S.Ct. 2348, 2357, 53 L.Ed.2d 320 (1977). Because most of those who employ workers for jobs on or over navigable waters also employ someone in a traditional maritime capacity, this second requirement was nearly always met, leaving the situs test as the only operative limitation on coverage.
 
 
 8
 The 1972 amendments expanded the definition of "navigable waters" to include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing or building a vessel ...." 33 U.S.C. § 903(a). See Caputo, 432 U.S. at 260-64, 97 S.Ct. at 2355-57. But an injury sustained in this expanded area is covered only if the employee was engaged in "maritime employment" which includes "any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker" but not "a master or member of any vessel or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U.S.C. § 902(3).
 
 
 9
 In Weyerhaeuser Co. v. Gilmore, 528 F.2d 957 (9th Cir. 1975), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), this court held that in order for an injured employee's work to be considered "maritime," it "must have a realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters,' " .... Id. at 961, quoting Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 272, 93 S.Ct. 493, 506, 34 L.Ed.2d 454 (1972).[2] Although D-H argues that the decedent's employment as a pile driver on a marine construction project fails to satisfy the Weyerhaeuser test for "maritime employment," we recently stated that the Act covers workers involved in construction related to maritime activities. Schwabenland v. Sanger Boats, 683 F.2d 309 at 311 (9th Cir. 1982). In Duncanson-Harrelson Co. v. Director (OWCP), 644 F.2d 827, 830 (9th Cir. 1981), a case involving facts very similar to the present appeal, we upheld the finding of the BRB that two employees, injured while constructing an off-shore dock for the unloading of oil from tankers, were engaged in maritime employment. One of the claimants was constructing a dolphin when his injury occurred. Similarly, the decedent in the present case was killed when the top of a dolphin piling he was cutting fell on him.
 
 B. Member of a Crew of a Vessel
 
 10
 D-H argues that decedent was a crew member as defined by section 2(3) of the Act, 33 U.S.C. § 902(3). Section 2(3) provides that "the term 'employee' means any person engaged in maritime employment ..., but such term does not include a master or member of a crew of any vessel ...." To find that an employee is a member of a crew excluded from coverage, the court must conclude that the vessel is in navigation, that the worker had a permanent connection with the vessel and that the employee was aboard the vessel primarily to aid in navigation. Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 36 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); accord, Burks v. American River Transportation Co., 679 F.2d 69, 75-76 (5th Cir. 1982). Whether the decedent was a master or crew member is primarily a question of fact. Longmire v. Sea Drilling Corp., 610 F.2d 1342, 1345 (5th Cir. 1980); Wilkes v. Mississippi River Sand & Gravel Co., 202 F.2d 383, 389 (6th Cir.), cert. denied, 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344 (1953). Thus, the finding of the ALJ that decedent was not a member of a crew must be affirmed if it is supported by substantial evidence. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 257, 60 S.Ct. 544, 547, 84 L.Ed. 732 (1940); Hardaway Contracting Co. v. O'Keeffe, 414 F.2d 657, 660-61 (5th Cir. 1968). The Supreme Court in Bassett stated that the question turns upon the employee's actual duties and held that the claimant's employment did not aid in navigation except for the incidental task of throwing the ship's rope or securing the line-duties which could be performed by any harbor worker. 309 U.S. at 260, 60 S.Ct. at 549. The ALJ in this case made similar findings regarding decedent Freer's duties. The ALJ stated:
 
 
 11
 (Decedent) did not have a permanent connection with the barge. He neither ate nor slept on the barge. In addition, he was not aboard the barge primarily to aid in navigation. See Ryan (v. McKie Co., 1 BRBS 221 (1975) ). Anything he did in this regard was incidental to his primary work as a pile butt. As the Court noted in South Chicago Coal & Dry Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 549 (84 L.Ed. 732), 'They were persons serving on vessels, to be sure, but their service was not of laborers ... and thus distinguished from those employees on the vessel who are naturally and primarily on board to aid in her navigation.' Moreover, it is not without significance that at the time of his death Mr. Freer was not even aboard the barge but instead was standing on the dolphin.
 
 
 12
 C.T., Vol. I at 198. The determination of the ALJ that decedent was not a member of a crew was upheld by the BRB. We affirm on the basis that the findings of the ALJ are supported by substantial evidence.
 
 IV. APPLICATION OF SECTION 910(c)
 
 13
 Claimant challenges the use of subsection (c) of section 910 of the Act and urges that subsections (a) or (b) should be applied to compute the decedent's average annual earnings.[3] The parties disagree on whether the issue is one of law or fact. We consider the nature of the decedent's work and the details of his employment to be factual findings. Whether particular facts fit within the meaning of certain legal terms is a question of law. Cf. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1047 n.3 (9th Cir. 1976) (characteristics of transaction are questions of fact, but whether such characteristics constitute a "sale for tax purposes" is a question of law); K. Davis, Administrative Law Treatise § 30.01 (3d ed. 1972) (circumstances of arrest are questions of fact, but whether such circumstances amount to "probable cause" is a question of law). But cf. Parkside, Inc. v. Commissioner, 571 F.2d 1092, 1094-95 & n.5 (9th Cir. 1977) (two judges concurred in result, no majority rationale) (whether realty was held "primarily for sale in the ordinary course ... of trade or business" is a question of fact arguably mixed with law, subject to the "clearly erroneous" standard of review).
 
 
 14
 To determine whether the ALJ applied the correct subsection of section 910 in computing decedent's average annual earnings, we must examine whether the employment in which decedent was engaged at the time of his injury was permanent and continuous, or seasonable and intermittent. O'Hearne v. Maryland Casualty Co., 177 F.2d 979, 980-81 (4th Cir. 1949). Courts must consider the type of job the worker held when he was injured, not his personal employment history. Id. Permanent and continuous jobs fall under subsections (a) or (b), whereas seasonal and intermittent jobs fall under (c). Palacios v. Campbell Industries, 633 F.2d 840, 842 (9th Cir. 1980); Strand v. Hansen Seaway Service, Ltd., 614 F.2d 572, 575 (7th Cir. 1980); Tri-State Terminals, Inc. v. Jesse, 596 F.2d 752, 754-55, 756 & n.3 (7th Cir. 1979); O'Hearne v. Maryland Casualty Co., 177 F.2d at 980-81; Marshall v. Andrew F. Mahony Co., 56 F.2d 74, 76-78 (9th Cir. 1932). Thus, for the ALJ to conclude, based on the decedent's employment history, that claimant's benefits should not be computed under either subsections (a) or (b) was error. We find, however, for the reasons set forth below that this was not a reversible error.
 
 
 15
 Assuming that decedent's job should have been classified permanent and continuous, whether the decedent was employed for "substantially the whole of the year" immediately preceding his injury determines which of subsections (a) or (b) should be applied. Palacios v. Campbell Industries, 633 F.2d at 842; O'Hearne v. Maryland Casualty Co., 177 F.2d at 981-82; see California Ship Service Co. v. Pillsbury, 175 F.2d 873, 876 (9th Cir. 1949). Compare 33 U.S.C. § 910(a) ("if the injured employee shall have worked ... during substantially the whole of the year") with 33 U.S.C. § 910(b) ("if the injured employee shall not have worked ... during substantially the whole of the year"). Subsection (a) computes an average daily wage based on the claimant's actual employment history, whereas subsection (b) computes this figure using the hypothetical history of a typical worker engaged in similar employment in the same general locality. Subsection (b) applies to claims in which the injured worker has had too little time on the job to permit an accurate and fair computation of average daily wage: for example, the subsection would apply if a worker had been recently hired after having been unemployed, or out of the work force, or in a lower paying position. See O'Hearne v. Maryland Casualty, 177 F.2d at 982; California Ship Service Co. v. Pillsbury, 175 F.2d at 876. In this case, the decedent has been on the job for several years, and the evidence in the record is sufficient to enable computation of his average daily wage based on his own employment record. Thus, the ALJ should have found that decedent worked "substantially the whole of the year," and claimant's benefits initially should have been determined under subsection (a).
 
 
 16
 We find, however, that the ALJ's decision to compute claimant Freer's benefits under subsection (c) rather than subsection (a) should be affirmed because the decedent's actual employment history indicates that application of subsection (a) would provide excessive compensation. Because subsections (a) or (b) are premised on the injured employee having worked the entire year without injury, computation of benefits under either of these subsections for a worker in seasonal employment would result in overcompensation. National Steel & Shipbuilding Co. v. Bonner, 600 F.2d 1288, 1291 (9th Cir. 1979); Tri-State Terminals, Inc. v. Jesse, 596 F.2d at 757-58; O'Hearne v. Maryland Casualty Co., 177 F.2d at 981; Marshall v. Andrew F. Mahony Co., 56 F.2d at 76-78. Similarly, the courts have held that even if the worker's employment is permanent and continuous, computation of the average annual wage must be determined pursuant to subsection (c) if (a) or (b) cannot "reasonably or fairly be implied." 33 U.S.C. § 910(c). Palacios v. Campbell Industries, 633 F.2d at 842; National Steel & Shipbuilding, supra, at 1291; Marshall, supra, at 76-78; see Todd Shipyards v. Director (OWCP), 545 F.2d 1176, 1179 (9th Cir. 1976). This can occur when there is insufficient evidence in the record to enable the ALJ to make an accurate computation under subsections (a) or (b), National Steel & Shipbuilding, supra at 1291; Todd Shipyards, supra, at 1179, or when such computation results in excessive compensation of the claimant in light of the injured worker's actual employment record. Johnson v. Britton, 290 F.2d 355, 357-59, (D.C.Cir.), cert. denied, 368 U.S. 859, 82 S.Ct. 99, 7 L.Ed.2d 56 (1961); Marshall, supra, at 78 (dicta); see Tri-State Terminals, supra, at 756. Although both possibilities are present here, we affirm the use of section 910(c) based on our finding that computation of Freer's benefits under subsections (a) or (b) would result in overcompensation and we do not reach the question of whether the evidence claimant introduced to show the earnings of a typical pile butt was insufficient.
 
 
 17
 Both subsections (a) and (b) compute the average annual wage of an employee working a five-day week by multiplying the worker's average daily wage by 260 (5 days a week X 52 weeks). Thus, if a claimant has worked less than 260 days in the year preceding his injury, he is overcompensated under subsection (a) or (b). When Congress amended section 910 of the Act in 1948 to reflect the five-day work week, it undoubtedly was aware that virtually no one in the country works every working day of every week; there are many reasons including illness, vacations, strikes, unemployment, family emergencies, etc. We can infer that Congress knew that both subsections (a) and (b) would result in some overcompensation, but retained the 260-day factor for administrative convenience. See generally O'Hearne v. Maryland Casualty Co., 177 F.2d at 982. But in Marshall v. Andrew F. Mohony Co., 56 F.2d 74, 78 (9th Cir. 1932), the court explained:
 
 
 18
 (I)t is not reasonable or fair to apply subdivisions (a) or (b) when to do so would result in ascertaining a mere theoretical earning capacity, having no regard to the actual facts of the case, but which would award arbitrarily to an injured laborer disability compensation in excess of what he was able to earn if at work, as shown by earnings.
 
 
 19
 Johnson v. Britton, 290 F.2d at 359.
 
 
 20
 Subsection (c) provides greater flexibility in determining an injured employee's average annual earnings. Consideration must be given to the previous earnings of the injured worker at the job where the injury occurred, the previous earnings of other workers in the locality employed in similar jobs, and other employment of the injured worker. 33 U.S.C. § 910(c); Palacios v. Campbell Industries, 633 F.2d at 842; National Steel and Shipbuilding Co. v. Bonner, 600 F.2d at 1292. The actual wages earned by the employee are not conclusive. Palacios, supra, at 843; National Steel and Shipbuilding, supra, at 1292. "It is manifest that the prime objective of § 10(c) was to insure that compensation awards would be based on accurate assessments of the claimant's earning capacity." Palacios, supra, at 843, citing Tri-State Terminals, Inc. v. Jesse, 596 F.2d at 756.
 
 
 21
 We do not believe that Congress contemplated overcompensation as large as that which would result in this case if Freer's benefits were to be calculated under subsections (a) or (b). This is a question of line-drawing-when does the disparity between the claimant's actual days worked and the 260-day factor become so large that computation of the average annual wage under subsection (a) or (b) becomes unreasonable or unfair? If Freer's benefits are calculated under subsection (a), claimant receives benefits for sixty-five (or 331/3 percent) more days than decedent actually worked. Because we find this disparity is large enough to justify application of subsection (c) in order to avoid excessive overcompensation of Freer, we uphold the ALJ's use of subsection (c).
 
 
 22
 V. EMPLOYER CONTRIBUTIONS TO PENSION AND HEALTH FUNDS
 
 The Act defines wages to include:
 
 23
 (T)he money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer.
 
 
 24
 33 U.S.C. § 902(13) (emphasis added). Claimant Freer urges that contributions to the union pension and health funds made by D-H on behalf of the decedent are within the meaning of section 902(13) and should have been included in the ALJ's calculation of the decedent's average annual wage.[4]
 
 
 25
 The ALJ determined that these employer contributions are not wages under the Act. Under the collective bargaining agreement, D-H paid its contributions directly to the trust fund, not the individual employees, thus the ALJ reasoned that "(t)his payment, which by its nature is not capable of being converted to the immediate advantage of the employee, is not a 'similar advantage' to 'board, rent, housing, lodging' within the meaning of section 2(13)." C.T., Vol. I at 202. The BRB affirmed, stating that these benefits are too speculative to be included in an employee's wages because "the employee has no entitlement to these benefits." Id. at 6-7. The BRB cited its previous decisions in Collins v. Todd Shipyards Corp., 5 BRBS 334, BRB No. 76-177 (Jan. 5, 1977) and Hilyer v. Morrison-Knudsen Co., 6 BRBS 754, BRB No. 76-410 (Sept. 30, 1977), rev'd, 670 F.2d 208 (D.C.Cir.1981), petition for cert. filed sub nom. Morrison-Knudsen Construction Co. v. Director, (OWCP), No. 18-1891 (April 13, 1982). In Hilyer, the Director of the Office of Workers' Compensation Programs (Director) successfully argued before the court of appeals that employer contributions to union pension plans should be included in computing an injured employee's average wage. 670 F.2d at 211-13. Since that time, the Director has abandoned the position argued in Hilyer and now urges this court to hold that such payments are not wages. We do not find any of the Director's arguments for rejecting Hilyer persuasive.
 
 
 26
 The Director correctly argues that the court must consider the language of the statute, guided by the plain and ordinary meaning of the words Congress used. Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1961). But the Director insists we must apply a narrow definition of wages which excludes fringe benefits because when Congress enacted the statute in 1927 it would not have considered such benefits to be part of an employee's wages.[5] The Director further argues that only by congressional amendment could the Act's description of "wages" be expanded to include fringe benefits.[6] Although the concept of wages may have changed since 1927, we do not find that Congress intended an inflexible meaning of "wages" in the definition provided by section 902(13).[7] Examining the plain meaning of the language Congress used, we note that several fringe benefits were listed including "the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer ...." Id. This language indicates a flexible definition encompassing other fringe benefits not specifically mentioned by Congress that provide the employee with a "similar advantage." Moreover, the standard of liberal construction of the Act in favor of claimants suggests that Freer's broader interpretation of "wages" should be adopted to include employer contributions to health and pension plans. See Voris v. Eikel, 346 U.S. 328, 74 S.Ct. 88, 98 L.Ed. 5 (1953); Baltimore & Philadelphia Steamboat Co. v. Norton, 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366 (1932).
 
 
 27
 We agree with the court's reasoning in Hilyer v. Morrison-Knudsen Construction Co., 670 F.2d at 211-13, that the Act's definition of "wages" includes the values received from the employer that are easily identifiable and calculable. Although not expressly mentioned in section 902(13), the BRB has included such values as vacation pay and overtime compensation within the Act's concept of "wages." Id. at 211. In Hilyer, employer contributions to benefit funds were found to be identifiable, calculable values and therefore included within "wages" under the LHWCA. Id.
 
 
 28
 The court in Hilyer attached little significance to the fact that the employer's contributions were made directly to the union benefit funds, not the employees, or that the employees exercised no control over the day-to-day management of the funds. The court found that these payments provided substantial economic value because if the employer did not provide health and pension benefits, the employees would have to spend their own money to acquire them. Id. at 211; see W.W. Cross v. NLRB, 174 F.2d 875, 878 (1st Cir. 1949). We agree that these contributions represent "an important part of the employees' total compensation, and an equally important part of the employer's labor costs." Hilyer, supra, at 212 n.7.
 
 
 29
 The Director argues that the Court's treatment of employer contributions in United States v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957), should not be interpreted to support claimant's position that the payments are wages under the Act. In Carter, the Court held employer contributions to a union benefit fund were part of the "sums justly due" to employees under the Miller Act, 40 U.S.C. §§ 270a et seq.[8] The surety in Carter argued that employer contributions made directly to trust funds were not "wages" owing to the employees and that its obligation had been satisfied by payment of all "wages" owed to them. Id. at 217, 77 S.Ct. at 797. The Court, however, construed the contributions to the health and pension funds to be part of the consideration that the employer agreed to pay its workers, id. at 217-18, 77 S.Ct. at 797, despite the terms of the trust agreement which expressly stated that such payments were not to be considered "wages" due the employees. Id. at 214, 77 S.Ct. at 795. Thus, contract provisions which purported to define pension fund contributions as something other than employee compensation did not stop the Court from finding the payments to be "sums justly due" the employees.
 
 
 30
 Applying a common sense approach, the Court in Carter reasoned that if the collective bargaining agreement had specified that the employer would pay each employee a certain amount above the prevailing wage, and if the employee had in turn contracted with his union to forward this amount to the pension fund, the contribution would be seen as part of the employee's compensation. See id. at 217, 77 S.Ct. at 797; Hilyer v. Morrison-Knudsen Construction Co., 670 F.2d at 212. Similarly, we conclude that the employer's payments in the present case should not be excluded from the computation of an employee's average weekly wage simply because D-H has eliminated two unnecessary steps by agreeing to pay the contributions directly to the union benefit funds. Id.
 
 
 31
 The Director relies on United States v. Embassy Restaurant, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959), in which the Court determined that benefit fund contributions were not entitled to the priority given to "wages ... due to workmen" under the Bankruptcy Act. Although acknowledging that unions bargain for these contributions as part of the employee's total wage package and that decisions under the National Labor Relations Act and the Social Security Act had treated various fringe benefits as "wages," the Court emphasized that its construction of "wages ... due to workmen" must be governed by the context of the Bankruptcy Act and by Congress' purpose in providing the priority. Id. at 33, 79 S.Ct. at 556. The Court expressed concern that the protection afforded employees by the priority given to their wages might be weakened if the workers had to share their recovery with the benefits plan. Id. at 33-34, 79 S.Ct. at 556. Thus, the Court construed "wages ... due to workmen" narrowly and found that Congress did not intend to include other forms of compensation. Id. at 35, 79 S.Ct. at 557. Here, by contrast, the LHWCA expressly includes several forms of compensation within its definition of "wages." Hilyer v. Morrison-Knudsen Construction Co., 670 F.2d at 213. Moreover, in accordance with the Act's remedial purpose, we find that Congress intended to include all identifiable values provided to employees in the formula for computing "wages" received in return for their labor at the time of injury. Id.
 
 
 32
 In sum, we find that the contributions of D-H to the union benefit plans must be included in the computation of the decedent's average weekly wage. Accordingly, the portion of the BRB's decision concerning employer contributions is reversed and we remand to the BRB for the computation of claimant's benefits in a manner consistent with this holding.
 
 
 33
 The ruling of the Benefits Review Board is AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 A dolphin is a free standing pier consisting of metal, concrete or wooden pilings which support a concrete deck. Dolphins are used as temporary docks and as abutments
 
 
 [2]
 We note that the Fifth Circuit in a recent en banc decision reexamined the Weyerhaeuser interpretation of "maritime employment" and, based on the legislative history of the 1972 amendments to the Act, rejected the view that Congress intended to withdraw coverage from workers who previously were entitled to benefits based on the "situs" test alone-i.e. workers injured on navigable waters whose employment was not maritime in nature. Boudreaux v. American Workover, Inc., 680 F.2d 1034 (5th Cir. 1982). The result in this appeal would be the same regardless of whether the Ninth or the Fifth Circuit's interpretation is applied: we find decedent's employment to be "maritime" even under the narrower Weyerhaeuser standard. The debate over the scope of "maritime employment" will be resolved when the Supreme Court reviews the Second Circuit's decision in Churchill v. Perini North River Associates, 652 F.2d 255 (2d Cir. 1981), cert. granted sub nom. Director (OWCP) v. Perini North River Associates, --- U.S. ----, 102 S.Ct. 1425, 71 L.Ed.2d 647 (1982). In Perini, the Second Circuit denied compensation under the Act to workers injured over navigable waters who were engaged in the construction of a sewage treatment plant. The court held that the work on the sewage treatment facility did not constitute "maritime employment."
 
 
 [3]
 33 U.S.C. § 910(a), (b), (c) provide in pertinent part:
 (a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.
 (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.
 (c) If either of the foregoing methods of arriving at the average annual earnings of the injured employee can not reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.
 
 
 [4]
 D-H agreed to pay pension fund benefits in the following amounts for each hour that each covered employee worked or was paid for, whichever is greater: 80 cents for work performed until September 1, 1974; 85 cents for work from that date until April 1, 1975; $1.15 for work from that date until July 1, 1975; $1.23 for work performed thereafter
 
 
 [5]
 The Director relies on the definition of "wages" provided in Webster's New International Dictionary 2863 (2d ed. 1957): "pay given for labor, usually manual or mechanical, at short intervals, as distinguished from salaries or fees." Webster's second edition, published originally in 1934, remained unchanged until the third edition, published in 1961. See Webster's Third New International Dictionary 6a, 7a (1961). In contrast the third edition states that "wages" often include "amounts paid by the employer for insurance, pension, hospitalization, and other benefits." Id. at 2569
 
 
 [6]
 The Director points to the legislative history of the 1964 amendment to section 1 of the Davis-Bacon Act, 40 U.S.C. § 276a(b), as indication that only by congressional amendment could the Act's definition of "wages" be expanded to include fringe benefits. While it is true that Congress' 1964 amendment defined wages to include employer contributions to trust funds, the Davis-Bacon Act is distinguishable because prior to the 1964 amendment, the statute did not provide any specific articulation of "wages." See Act of March 3, 1931, c. 411, § 1, 46 Stat. 1494; Act of Aug. 30, 1935, c. 825, 49 Stat. 1011; Act of June 15, 1940, c. 373, § 1, 54 Stat. 399; Act of July 12, 1960, P.L. 86-624, § 26, 74 Stat. 418. Because Congress envisioned the inclusion of certain fringe benefits in its definition of "wages" under the LHWCA, we disagree with the Director's argument that new legislation is required to reflect modern concepts of wages
 
 
 [7]
 The Director contends that the Supreme Court's decision in Potomac Electric Power Co. v. Director (OWCP), 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980) (PEPCO ), supports the view that we must interpret the term "wages" according to the definition that was commonly accepted in 1927. We disagree
 In PEPCO, the court of appeals had held that computation of the employee's award under the Act's schedule benefit provisions was inappropriate because these provisions provided inadequate compensation for claimant's permanent partial disability. But the Supreme Court rejected computation under an alternative provision and reaffirmed the applicability of the Act's schedule benefit provisions as enacted in 1927 to determine the claimant's benefits. Although acknowledging the "recent trend" in workmen's compensation decisions away from the position that scheduled benefits are exclusive, the Supreme Court found such flexibility unsupported by the statute and inconsistent with Congress' intent. Id. at 276-80, 101 S.Ct. at 514-516.
 In the present appeal, we are not determining whether the provisions of section 902(13) should be ignored in light of more modern concepts of "wages" or decisions affording greater latitude. We are interpreting a definition of "wages" which by its terms provides some flexibility. Congress specifically listed several fringe benefits in its definition of wages and stated that other benefits providing "similar advantage" should also be considered. See 33 U.S.C. § 902(13).
 
 
 [8]
 Section 1(a)(2) of the Miller Act requires that before contracts above $2,000 are awarded for construction involving public buildings, the contractor must post a payment bond with a satisfactory surety "for the protection of all persons supplying labor and material." 40 U.S.C. § 270a(a)(2)
 Section 2(a) provides that "(e)very person who has furnished labor or material in the prosecution of the work provided for in the contract ... and who has not been paid in full therefor ... shall have the right to sue on such payment bond ... for the sum or sums justly due him ...." 40 U.S.C. § 270b(a) (emphasis added).