698 F.2d 743
 1984 A.M.C. 301
 NEWPARK SHIPBUILDING & REPAIR, INCORPORATED and American
Home Assurance Company, Petitioners,
v.
James P. ROUNDTREE and Director, Office of Workers'
Compensation Programs, United States Department of
Labor, Respondents.
 No. 81-4308.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 22, 1983.
 
 E.D. Vickery, Houston, Tex., for petitioners.
 Stephen Vaughan, Houston, Tex., for Roundtree.
 Laurie M. Streeter, Assoc. Sol., Mark C. Walters, Marianne Demetral Smith, U.S. Dept. of Labor, Washington, D.C., for respondents.
 Petition for Review of an Order of the Benefits Review Board.
 Before GARZA, TATE and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge.
 
 
 1
 This appeal arises from a claim for workers' compensation under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Sec. 901 et seq. The employer urges that we find jurisdiction to lie in this appeal and that we rule on the proper statutory basis for computing compensation benefits under the facts presented. We find that jurisdiction does lie, and that Sec. 10(b) of the Act, 33 U.S.C. Sec. 910(b), is the proper statutory basis by which to compute benefits in this case.
 
 I. Background
 
 2
 James Roundtree has been a welder in the shipyards since 1941, and he worked as an independent contractor between 1954 and 1975. During the last days he worked as an independent contractor, he charged a rate of $12.50 per hour for his services. For a variety of personal and career-related reasons, Roundtree abandoned his work as an independent contractor and began working as an hourly employee for the firm now known as Newpark Shipbuilding. Roundtree's wage as a welder was $5.50 per hour, with available overtime and a ten cent per hour shift differential. Other welders in the shipyard were paid as much as $5.95 per hour at the time.
 
 
 3
 Roundtree's first day on the job, April 22, 1975, was an unfortunate one for him. He was working on a barge. While welding a hole that had been fitted and tacked, Roundtree fell off his scaffold and injured his back, resulting in his disability. His claim for workers' compensation under LHWCA came before an Administrative Law Judge (ALJ) with the Office of Workers' Compensation Programs. The ALJ determined that Roundtree was entitled to compensation, and then considered the possible methods for computing Roundtree's average weekly wage pursuant to Sec. 10 of the Act. The ALJ first considered Sec. 10(a), which looks to the employee's wages during the prior year, and found that subsection inapplicable because of the change in Roundtree's employment from independent contractor to hourly employee. He then considered Sec. 10(b), which looks to the prior year's wages of coworkers performing the same or similar work. The ALJ rejected that theory, in part because the shipyard workers had recently received a wage hike that would not be reflected fully in a Sec. 10(b) calculation based on twelve prior months. He therefore concluded that it would not be "fair and equitable" for Sec. 10(b) to apply, and looked to Sec. 10(c) for guidance. Section 10(c) points toward the earnings potential of the employee at the time of injury, rather than actual prior wages. Applying Sec. 10(c), the ALJ looked at Roundtree's earnings capacity as an independent contractor and determined his weekly wage to be $360.41, approximately $10.29 per hour, based on Roundtree's earnings of $18,741.20 in the preceding year. He then ordered compensation accordingly as provided in Sec. 8(b).
 
 
 4
 Both Roundtree and his employer appealed to the Benefits Review Board (BRB). The employer argued that Sec. 10(b) rather than Sec. 10(c) should control. Roundtree cross-appealed to call for application of Sec. 10(a), but apparently switched his view during the BRB proceedings and agreed with the ALJ's application of Sec. 10(c). The BRB affirmed the use of Sec. 10(c) for determining the weekly wage, but ruled that the ALJ had erred in using the gross earnings of an independent contractor for determining the amount of Roundtree's weekly wage. The BRB suggested that the net earnings of an independent contractor, after business expense deductions, might be an appropriate wage determination. In any event the BRB remanded for a redetermination of Roundtree's weekly wage under Sec. 10(c).
 
 
 5
 The employer appeals the BRB's ruling to this Court, pursuant to Sec. 21(c) of the Act, 33 U.S.C. Sec. 921(c). It argues that Sec. 10(b) rather than Sec. 10(c) should control this determination of average weekly wage. Further, it argues that the appeal is ripe for review as a "final order" because the record in this case is sufficiently complete. It urges that an appellate determination of this question will effectively terminate the litigation. Since our authority to review an administrative ruling under LHWCA is limited to "final orders", 33 U.S.C. Sec. 921(c), we must begin by examining our jurisdiction over the subject matter of this case.
 
 
 6
 II. Examination of Subject Matter Jurisdiction
 
 
 7
 Appellate review of BRB orders is restricted under 33 U.S.C. Sec. 921(c) to "final orders".[1] The "final order" requirement follows the contours of the finality rule expressed in 28 U.S.C. Sec. 1291. Director, Office of Workers' Compensation Programs v. Brodka, 643 F.2d 159, 161 (3d Cir.1981); National Steel and Shipbuilding Co. v. Director, Office of Workers' Compensation Programs, 626 F.2d 106, 107-08 (9th Cir.1980). The requirement sometimes, but not always, excludes from appellate review a remand order to an administrative agency. Id. at 108; United Fruit Co. v. Director, Office of Workers' Compensation Programs, 546 F.2d 1224, 1225 (5th Cir.1977). We believe, however, that the case before us is properly reviewable at this time even though the administrative body directed a remand.
 
 
 8
 Our determination of whether jurisdiction lies does not depend on a single formula or a simple rule. "The inquiry requires some evaluation of the competing considerations underlying all questions of finality--'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.' " Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974), quoting Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950).
 
 
 9
 This Circuit recently faced the question of what constitutes a final administrative order in a LHWCA case. In Ingalls Shipbuilding Division, Litton Systems, Inc. v. White, 681 F.2d 275 (5th Cir.1982), White and his employer entered into a compromise settlement of his LHWCA workers' compensation claim resulting from White's employment-based injury. An ALJ approved the settlement agreement after a cursory examination. The Director of the Office of Workers' Compensation Programs appealed the order of the ALJ to the Benefits Review Board, which held that the Director had standing to challenge the settlement, and that the ALJ's approval of the settlement must be set aside. The BRB remanded the claim to the ALJ, and the employer appealed to this Circuit.
 
 
 10
 We noted first that considering the appeal would not raise the specter of piecemeal review before the court, id. at 279, because the record was complete, the legal conclusions had been made, and the issue on appeal was only whether the power of the ALJ had been exercised properly. Reaching the merits effectively eliminated the need for later review, while dismissal would only have caused the same legal issue to come before us after the agency held additional hearings based on its tentative interpretation of its role. We therefore recognized jurisdiction.
 
 
 11
 Similarly in the case before us today, the issue presented challenges the proper legal standard, rather than constitutes a factual dispute. The record itself is factually complete, and application of Sec. 10(b) can be accomplished on the record. The only question presented is that of ruling on the proper formula.
 
 
 12
 If we were to dismiss for lack of jurisdiction, the next proceeding would be the ALJ's application of Sec. 10(c) to the record and a pronouncement of a definite monetary award. If applying Sec. 10(c) is not supported in the law, that proceeding would be a wasted one. If, however, we were to defer our review and determine at a later date that there is no error, we would have little effect on the risk of piecemeal review but merely would delay the resolution of the dispositive issue in the case. No party has raised any other issues on appeal, and there is little risk of a new appellate issue developing in the proceedings to come.
 
 
 13
 With our decision today, the remaining issues will not be questions of law but merely the largely ministerial job of applying the law to the preexisting record. This task is properly left to the sound discretion of the administrative body. Obviously our decision would be definitive guidance to the agency. Hence, we believe that the order of the BRB is ripe for review.
 
 
 14
 We recognize that cases in this and other Circuits have denied appellate review of pending actions from the BRB. But these cases involved incomplete determinations or administrative records, thus placing them in a less "final" posture than Ingalls or the immediate case. In United Fruit Co. v. Director, Office of Workers' Compensation Programs, supra, we dismissed the appeal as untimely. The unresolved issues were more than a simple calculation of disability benefits; the ALJ had not properly ruled on the nature and extent of the employee's disability, or the "possible liability of the special second injury fund." In Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, United States Dep't of Labor, 535 F.2d 758 (3d Cir.1976), (per curiam) the court dismissed the appeal, because, even though liability had been decided, the extent of disability due to the worker's loss of hearing remained undetermined. In Newport News Shipbuilding and Dry Dock Co. v. Director, Office of Workers' Compensation Programs, 590 F.2d 1267 (4th Cir.1978) (per curiam), the ALJ had not made complete findings as to "the nature of the injury, the degree of physical impairment ... and any other factor ... including the effect of disability as it may naturally extend into the future." Id. at 1269, quoting 33 U.S.C. Sec. 908(h). All these cases, unlike the case before us, had unresolved factual determinations that appellate review could not settle.
 
 
 15
 The Director of the Office of Workers' Compensation Programs (Director), respondent in this case, offers a different argument in urging a narrow construction of the term "final order". He presses an analogy to attorneys' fees cases, where courts have held that an order is not final, hence not appealable, until the amount of awarded attorneys' fees is determined. Since, in the case before us, the determination of disability is known but the dollar amount of the award must still be set, the Director urges that the same principles of lack of finality apply in this case as in the attorneys' fees cases.
 
 
 16
 In Director, Office of Workers' Compensation Programs v. Brodka, 643 F.2d 159 (3d Cir.1981), the Third Circuit held that a LHWCA case is not yet final when the substantive claim and the availability of attorneys' fees are both settled but the amount of the attorneys' fees award is undetermined. Similarly, in Croker v. Boeing Co. (Vertol Division), 662 F.2d 975 (3d Cir.1981) (en banc), the court determined that a district court order is not final for purposes of 28 U.S.C.A. Sec. 1291 until the amount of attorneys' fees has been settled. This Court has held similarly. E.g., Williams v. Ezell, 531 F.2d 1261, 1263 (5th Cir.1976).
 
 
 17
 We acknowledge that an order is not "final" under 28 U.S.C. Sec. 1291 until the amount of awarded attorneys' fees has been determined. However, we find those cases distinguishable. In the attorneys' fees cases, the applicable legal standard is already established when the district court rules on the award. There need be no appeal at that time regarding what the law ought to be for the determination. See Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) (Title VII case, 42 U.S.C. Sec. 2000e et seq., establishing a twelve-pronged test in awarding attorneys' fees). But at that point, the record would not yet contain the factual material needed to rule on the amount of the award. The case before us, by contrast, already contains uncontested full factual findings.[2]
 
 
 18
 Furthermore, these cases usually come before an appellate court with challenges to both the merits and the award of attorneys' fees. To hold an order to be final before the final award of attorneys' fees would only lead to two appeals, one on the merits and one on the attorneys' fees, with no corresponding increase in the fundamental fairness to the parties. Such is not the case here.[3]
 
 
 19
 The Supreme Court has stated that the question of finality deserves a "practical rather than a technical construction" because it would be "impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality." Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964) (exceptions to finality rule under 28 U.S.C. Sec. 1291). In the case before us, the question on appeal is to determine the proper legal standard to be applied. Our decision will settle this question and minimize the risk of a wasted agency hearing and a later appeal. We find that an appeal at this stage in this case will be more efficient and will not prejudice the parties, especially since the employee's workers' compensation checks will not reflect the proper award until the conclusion of this litigation. Accordingly, we recognize appellate jurisdiction in this case where the substantive legal issue is clearly posed and all that will remain after it is decided is use of the record already completed to calculate the wage base for the recovery.
 
 
 20
 III. Determination of the Proper Legal Standard
 
 A. General Considerations
 
 21
 The substantive dispute before us is not a complex one. We must decide which of three statutory formulas is to be used in computing Roundtree's weekly wage base for purposes of workers' compensation benefits under LHWCA. Roundtree's somewhat unusual situation, having changed on the very day of his injury from independent contractor at $12.50 per hour to hourly employee at $5.50 per hour makes the method of computation an issue of intense concern to the parties.
 
 
 22
 Our standard of review is necessarily limited, Presley v. Tinsley Maintenance Service, 529 F.2d 433, 436 (5th Cir.1976), to whether the administrative findings are supported by substantial evidence, Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 467, 88 S.Ct. 1140, 1145, 20 L.Ed.2d 30 (1968), in accord with the law, Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947), and not arbitrary, O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc., 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965) (per curiam).
 
 
 23
 The nature of our review is also restricted by the statutory scheme of Sec. 10. The statute assumes that most workers will fall into subsection (a), which looks to the actual wages of the injured worker in the year prior to the injury as the monetary base for determination of the amount of compensation. Subsection (b) operates only where subsection (a) cannot be applied due to a fundamental change in the nature of the injured worker's employment. Method (b) looks to the actual wages of other workers in the same employment situation. The statute presumes that either (a) or (b) will fit the circumstances of the injured employee in most cases, but adds the "earnings capacity" formula of subsection (c) as a general, "catch-all" provision in case the other methods cannot be used as, for example, where the employee has worked for substantially less than a year and there are no other employees in the particular business whose jobs are comparable. Our task, then, is not to choose the most attractive method, but to determine which of the formulas is called for by the step-by-step statutory scheme.
 
 B. Specific Determination
 
 24
 Roundtree urges on appeal, as he had in the proceedings below, that Sec. 10(a) of the Act controls. Basically, Sec. 10(a) relies on the actual wages of the injured employee during the previous year.[4] Roundtree was earning between $10.50 and $12.50 per hour during the previous year as an independent contractor.
 
 
 25
 However, we agree with both the ALJ and the BRB that Sec. 10(a) is not a proper formula to be applied in this case. Roundtree had a complete change in the nature of his employment when he voluntarily relinquished his self-employment as independent contractor and accepted an hourly job in the shipyard. This change was not a simple change in employer or place of business. Jobhoppers performing substantially the same work for different employers are covered by the 10(a) formula just as are their less peripatetic coworkers. But Roundtree's situation is much further removed from 10(a) applicability.
 
 
 26
 First of all, his prior work as an independent contractor was not "covered employment" under workers' compensation, since he was self-employed. Under Sec. 10(a) he had no employer. Further, Roundtree's new position required only the skills of a welder, while his work as a contractor, as the ALJ found, entailed "a considerable amount of expenses involved in operating his own business such as purchasing oxygen, welding rods, hand tools, acetylene, a welding rig mounted to his truck, insurance coverage, as well as various utility expenses." Self-employment also requires a knowledge of bookkeeping, contracts, and government regulations that an hourly job does not demand. Finally, an independent contractor works on a job basis and may well not be working a full 40 hour week every week. These critical distinctions explain, at least in part, why workers like Roundtree would trade a $12.50 an hour contractor's life for a $5.50 guaranteed wage. Since Roundtree was not "employed" for the year prior to the accident, he was not working in the same employment on the day of the accident, and Sec. 10(a) is not applicable.
 
 
 27
 The employer contends that Sec. 10(b) is the proper formula. Subsection (b) determines a weekly wage by counting the last year's wages of coworkers performing substantially the same work at the same place of employment as the injured worker.[5] This subsection applies
 
 
 28
 to claims in which the injured worker has had too little time on the job to permit an accurate and fair computation of average daily wage: for example, the subsection would apply if a worker had been recently hired after having been unemployed, or out of the work force, or in a lower paying position. See O'Hearne v. Maryland Casualty, 177 F.2d at 982; California Ship Service Co. v. Pillsbury, 175 F.2d at 876.
 
 
 29
 Duncanson-Harrelson Co. v. Director, Office of Workers' Compensation Programs, 686 F.2d 1336, 1341-42 (9th Cir.1982).
 
 
 30
 The record shows that the employer presented pay records of three welders who performed comparable work at the same site. This is an adequate statistical base for Sec. 10(b) purposes, even though there were over 100 welders in the shipyard at the time. There was no attempt to introduce any evidence that these three were not doing comparable work and instead were picked as the lowest-earning welders. Absent such an intent to distort the comparable wages, even one worker's pay record could fulfill the statutory requirement.[6]
 
 
 31
 The Director counters the claim of Sec. 10(b) applicability by pointing out that Sec. 10(b) should not be used when the result would fail "reasonably and fairly" to represent the worker's earnings. The Director urges us to uphold the application of Sec. 10(c).[7]
 
 
 32
 The Director points out that the welders in this shipyard received a 50 cent per hour wage increase just two months before Roundtree's accident. Examining ten months of older, lower wages with only two months of the then-current wages would diminish Roundtree's compensation base. Since the purpose of the overall statute is to compensate the injured worker, the Director argues, the government should take all possible steps to provide the employee with the maximum recovery allowable under the statute. Hence, he urges us to affirm the BRB's use of Sec. 10(c).
 
 
 33
 We are sympathetic to the Director's view that claimants should receive the maximum compensation allowable under the statute. However, we find that an award under Sec. 10(c) is not allowable under the statute in the case before us, and we hold that Sec. 10(b) is the applicable formula.
 
 
 34
 First, we point out that the statutory hierarchy of compensation formulas will allow the use of Sec. 10(c) only when neither Sec. 10(a) or Sec. 10(b) can be applied "fairly and reasonably". The Director argues that any substantial wage increase within the year preceding injury would make Sec. 10(a) or Sec. 10(b) unfair, and that the larger the raise and the closer to the date of injury, the more unfair the other methods become. He believes that any worker whose employer gave a substantial raise before the date of injury should be able to claim a Sec. 10(c) "catch-all" computation, whether or not that worker has been employed there for the entire previous year.
 
 
 35
 Yet such an interpretation is not in keeping with the intent of the statute, for it would effectively eradicate virtually all applications of methods (a) or (b). Most employers now offer some sort of annual wage boost. Congress, in creating this statutory scheme, did not intend for Sec. 10(a) and Sec. 10(b) to be wiped off the books. The "catch-all" provision of Sec. 10(c) is properly to be applied only in cases where it would be unrealistic to apply the normal formulas. As legislative history describes Sec. 10(c):
 
 
 36
 This subsection in the present law is used where the employment itself, in which the injured employee was engaged when injured, does not afford a full year of work.... Thus, subsection (c) applies to seasonal, intermittent, discontinuous, and like employment which affords less than a full workyear or workweek.
 
 
 37
 Senate Rep. No. 1315, 80th Cong., 2d Sess., reprinted in [1948] U.S.Code Cong.Serv.1979, 1982, quoted in Strand v. Hansen Seaway Service, Ltd., 614 F.2d 572, 575 (7th Cir.1980).
 
 
 38
 Case law clarifies the limited nature of Sec. 10(c). In Todd Shipyards Corp. v. Director, Office of Workers' Compensation Programs, 545 F.2d 1176 (9th Cir.1976), the court upheld the use of Sec. 10(c) when "no evidence was introduced which could clearly determine the claimant's average daily wage" under Sec. 10(a) or Sec. 10(b). Id. at 1179 (emphasis added). The Ninth Circuit also stated in Palacios v. Campbell Industries, 633 F.2d 840, 842 (9th Cir.1980) that "[s]ection 10(c) applies to intermittent and irregular employment, when application of the mathematical formulas provided in sections 10(a) or 10(b) would be unreasonable or unfair, or when insufficient evidence is presented at the hearing to permit proper application of section 10(a) or (b)."
 
 
 39
 On occasion, some courts have recognized a general unfairness in using Sec. 10(a) or Sec. 10(b) when those formulas would not reflect a claimant's earning capacity at the time of injury. These cases usually involve a worker who had been off the job for much of the preceding year, so that a Sec. 10(a) determination of wages while working would lead to a significantly larger computed wage base than the worker's actual earnings during the prior year. In Strand v. Hansen Seaway Service, Ltd., supra, the Seventh Circuit found that where a cold water port is normally closed for fixed times of year, the use of Sec. 10(a) or Sec. 10(b) to determine an average weekly wage would be unreasonable and unfair. In Duncanson-Harrelson Co. v. Director, Office of Workers' Compensation Programs, 686 F.2d 1336 (9th Cir.1982), the Ninth Circuit upheld the use of Sec. 10(c). The court admitted that use of Sec. 10(c) might be error, but refused to reverse because the use of Sec. 10(a) would have inflated the worker's wage base unfairly. See also Johnson v. Britton, 290 F.2d 355 (D.C.Cir.), cert. denied, 368 U.S. 859, 82 S.Ct. 99, 7 L.Ed.2d 56 (1961) (Sec. 10(a) would result in a "highly distorted earnings figure" when the worker worked only 180 days of the prior 52 weeks).
 
 
 40
 In Andrew F. Mahony Co. v. Marshall, 56 F.2d 74 (9th Cir.1932), the court sanctioned the use of Sec. 10(c) to an intermittent employee. Winkler, the employee, had earned $1,266.20 in the year prior to his injury, and was awarded the maximum $25.00 weekly compensation, based on the higher wages of a coworker. Recognizing that Sec. 10(b) would provide greater compensation to Winkler than he had earned through his prior, intermittent employment, the court allowed the use of Sec. 10(c). The court stated that Sec. 10 "does not provide that every case must be measured by subdivisions (a) or (b) if it is possible to force the transaction into the formula which those subdivisions prescribe and that subdivision (c) is to be applied only to cases which cannot be measured by (a) or (b)." Id. at 78. However, the use of subsection (b) in the case before us does not require forcing or even a gentle push. It is method (c) that calls for the push--a push that would give Roundtree the benefit of the recent raise in the shipyard.
 
 
 41
 It is the clear intent of the statute that if one of Roundtree's co-workers was injured and he had worked for the whole of the preceding year, Sec. 10(a) would apply. When this was pointed out to government counsel during oral argument, counsel was forced to take the position that any welder in the shipyard who was injured should be able to claim a wage base calculated under Sec. 10(c). We cannot accept such a departure from the manifest statutory scheme. We hold that Sec. 10(b) is the applicable formula by which to compute Roundtree's wage base.
 
 IV. Conclusion
 
 42
 We find that this Court has jurisdiction over the subject matter of this appeal. Further, we hold that Sec. 10(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Sec. 910(b), sets out the proper formula by which to determine Roundtree's workers compensation benefits. We therefore reverse the Benefits Review Board and remand for proceedings consistent with this opinion.
 
 
 43
 REVERSED AND REMANDED.
 
 TATE, Circuit Judge, dissenting:
 
 44
 With respect for my brethren of the majority, I nevertheless dissent from their holding that the present order of remand by the Benefits Board of Review is a "final order" and, thus, subject to judicial review at this time. 33 U.S.C. Sec. 921(c). In a commendable effort to expedite judicial review in the present case, the majority has adopted a principle of case-by-case determination of "finality" that will, however, unsettle the relative certainty that was previously attached to that concept. While the benefits of expeditious review in the present case may be apparent, the general rule enunciated will require, as its consequence, many premature appeals in the future and much additional resultant delay before the final award or rejection of compensation claims.
 
 
 45
 In the present case, the principal (but not the only) issue before the Administrative Law Judge and the Board was whether the injured employees should be awarded compensation based upon Sec. 10(a) (the employee's wages during the prior year), or upon Sec. 10(b) (prior years' wages of coworkers), or upon Sec. 10(c) (an alternative, when either of the former methods "cannot reasonably be applied" to arrive at the annual earnings of the injured employee) of the Act, 33 U.S.C. Sec. 910(a), (b), or (c). Affirming the ALJ, the Board held that Sec. 10(c) applied to the facts of this case, but it remanded for additional findings of fact, with leave to reopen the record to take additional evidence, for a redetermination of the claimant's weekly wage, as well as for consideration of other issues, such as attorney's fees. Independent of whether we ultimately decide whether the Board was correct in finding Sec. 10(c) to provide the proper method for computing the award of compensation,[1] we must first decide whether this order was "final" so as to permit us to exercise appellate jurisdiction to review it.
 
 
 46
 The majority notes, correctly, the settled jurisprudence to the effect that the "final order" appealability-requirement of 33 U.S.C. Sec. 921(c), with regard to Board decisions, is essentially determined by the same criteria that apply to the "final judgments" appealability-requirement of 28 U.S.C. Sec. 1291 with regard to district court decisions.[2] As to the latter, the Supreme Court recently reiterated the test of finality as being " 'a decision by the District Court that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." ' " Firestone Tire & Rubber Company v. Risjord, 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981). The Court emphasized several of the important purposes served by the requirement of finality: the avoidance of piecemeal appeals and of the obstruction to just claims by permitting a succession of separate appeals from the various rulings to which litigation may give rise, as well as the promotion of efficient judicial administration. Id. As this court itself has reiterated,
 
 
 47
 [The finality] requirement has the support of considerations generally applicable to good judicial administration. It avoids the mischief of economic waste and of delayed justice. Only in very few situations, where intermediate rulings may carry serious public consequences, has there been a departure from this requirement of finality for federal appellate jurisdiction.
 
 
 48
 In re Corrugated Container Antitrust Litigation, 611 F.2d 86, 89 (5th Cir.1980).
 
 
 49
 The present Board order, although determining a central issue of the claim--the method of calculating weekly compensation due--, remanded the proceedings to the Administrative Law Judge for further findings as to the actual weekly rate to be awarded and as to attorney's fees. It did not end the litigation on the merits, and no final administrative order awarding weekly compensation and attorney's fees would be entered until after the remand.
 
 
 50
 Under such circumstances, where in effect a central issue of liability has been determined to administrative finality by the Board but remand is ordered to calculate and make a specific monetary award, the decisions until the present have uniformly refused to consider the Board order of liability as "final" for purposes of judicial reviewability at that time, both in this circuit, United Fruit Company v. Director, Office of Workers' Compensation Programs, 546 F.2d 1224 (5th Cir.1977), and in other circuits, Director, Office of Worker's Compensation Programs v. Brodka, 643 F.2d 159 (3d Cir.1981); National Steel and Shipbuilding Company v. Director, Office of Workers' Compensation Programs, 626 F.2d 106 (9th Cir.1980); Newport News Shipbuilding Corporation v. Director, Office of Workers' Compensation Programs, 590 F.2d 1267 (4th Cir.1978). As stated in one of the lead decisions applying this rule, "[i]t is a well-established rule of appellate jurisdiction ... that where liability has been decided but the extent of damages remains undetermined, there is no final order." Sun Shipbuilding & Dry Dock Company v. Benefits Review Board, 535 F.2d 758, 760 (3d Cir.1976).
 
 
 51
 The virtues of this rule are apparent. It avoids dual appeals on both liability and award, with the consequent doubled judicial appellate delays, in favor of a single review of the final administrative award. An injured worker, whose award is vacated by the Board for recalculation as to the properly exact amount of weekly compensation due, does not suffer the prolonged denial of compensation that will occur as his employer seeks judicial review of the singled issue of liability (which, moreover, in the preponderant number of cases will be affirmed) decided by a Board opinion that affirms liability but vacates and remands for exact calculation. The certainty of the rule of nonfinality in such instances permits all parties to rely on judicial review only after administrative remand and final calculation of the actual award, without being forced to take a precautionary appeal to the courts lest a failure to do so result in the loss of judicial review of the liability issue as determined by the Board's remand order, if it is subsequently characterized as "final" as to the liability decision.
 
 
 52
 In failing to follow this (until now) well-settled jurisprudential rule, the majority analyzes the facts and issues of this particular case, and decides that because in this particular case the appellate court decision now will determine the proper legal standard to be applied on the remand, and minimize the risk of a wasted agency hearing and later appeal, an appeal at this stage of the proceedings in this case will be more efficient and will not prejudice the parties (because the proper award of compensation cannot be made until the conclusion of the litigation). The majority concludes that we will "recognize appellate jurisdiction in this case where the substantive legal issue is clearly posed and all that will remain after it is decided is use of the record already completed to calculate the wage base for recovery."
 
 
 53
 Before noting some of the practical consequences to this newly created exception from the "finality" requirement for reviewability of administrative orders, I point out the tenuous authority upon which creation of this exception is based. Unlike all of the previously cited decisions, the majority does not advert to the traditional and quite limited exceptions to the finality rule rarely permitted. See, e.g., Brodka, supra, 643 F.2d at 163 & n. 9 (collateral order final in nature and severable from merits; irreparable injury; unresolved issues purely ministerial in nature); 16 Wright, Miller, Cooper and Gressman, Federal Practice and Procedure, Sec. 3942, see esp. at p. 314 (1977); 15 Wright, Miller and Cooper, Federal Practice and Procedure, Sec. 1910-13 (1976). Rather, the majority purports to find in Ingalls Shipbuilding Division v. White, 681 F.2d 275 (1982), a rather free-wheeling authority to dispense with the finality requirement in any individual case where the spectre of piecemeal review is not raised because in a given case the record is complete, the issue presented is a legal standard rather than a factual dispute, and the same legal issue (perhaps incorrectly decided initially by the Board) would recur on the subsequent resort to judicial review after the remand.
 
 
 54
 Ingalls, however, is a case presenting exceptional and distinguishable facts. The sole issue there concerned whether an administrative law judge had the power to approve a settlement, with an important collateral question as to the reviewability or not of a settlement so approved, as against contentions (ultimately upheld by us) that the judge was without authority to do so and that the Director, Office of Workers' Compensation Programs, did have standing to appeal the ALJ's order approving the compromise. The Board had upheld such power in the ALJ, but had remanded for his reconsideration of certain factors. Balancing competing considerations of piecemeal review and the danger of denying justice by delay in the decision of this crucial issue in the administration of the compensation act, Ingalls concluded that "the facts here fall within the unique situation that is established as an exception to technical finality in Gillespie [v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964).]" 681 F.2d at 279 (emphasis added).
 
 
 55
 Ingalls did not explicitly specify the unique and exceptional facts. However, its reference to Gillespie--where, as in Ingalls, there was a close or at least unresolved issue as to the appealability itself of the basic order (in Ingalls, on whether any order of an ALJ approving a settlement was reviewable at the instance of the Director)--would indicate to me that no blanket exception to finality was intended whenever, in a panel's view, the spectre of piecemeal review was not raised by deciding the initial appeal. That the "pragmatic finality" exception to finality recognized by Gillespie applies only in extremely limited and extraordinary circumstances may be recognized by the Supreme Court's recent characterization of that decision's holding:
 
 
 56
 In Gillespie, the Court upheld an exercise of appellate jurisdiction of what it considered a marginally final order that disposed of an unsettled issue of national significance because review of that issue unquestionably 'implemented the same policy Congress sought to promote in Sec. 1292(b),' id., at 154, 85 S.Ct. at 312, and the arguable finality issue had not been presented to this Court until argument on the merits, thereby ensuring that none of the policies of judicial economy served by the finality requirement would be achieved were the case sent back with the important issue undecided.
 
 
 57
 Cooper & Lybrand v. Livesay, 437 U.S. 463, 477 n. 30, 98 S.Ct. 2454, 2462 n. 30, 57 L.Ed.2d 351 (1978).
 
 
 58
 The present petition for judicial review of a Board order presents no unusual or unique circumstances such as are implicated in Gillespie or in the quite limited exceptions to finality previously recognized. Absent the present decision by the majority, there was no issue of marginal appealability that justified this court's immediate determination of the appealability issue and of the correctness of the underlying order. The issue decided, although important, is not of such national significance to the administration of the Act as to require its decision on this (premature) appeal rather than by the appeal from the final order that awards compensation and resolves all unsettled issues. Nor, for reasons to be set forth, does the new general exception to finality created by the majority avoid thwarting the purposes of the finality rule.
 
 
 59
 Rather, by importing into the finality concept a case-by-case measure of exception, in general application the newly created judicial exception substantially impedes these purposes of the finality concept and must inevitably result in multiple appeals, additional delays before final decision, and new issues of appellate jurisdiction that will impede the decision by judicial review of the merits of administrative orders. This may be illustrated by reference to the present proceedings.
 
 
 60
 The majority's exception permits immediate reviewability, despite technical non-finality, where the record is complete as to factual matters and where only a legal standard is at issue, immediate decision of which will facilitate the ultimate decision after remand. With regard to the present case, I note:
 
 
 61
 1. The majority assumes the record is complete, probably subconsciously influenced by its ultimate determination that Sec. 10(c) does not apply and that the record now contains all facts needed to decide under Sec. 10(b). Absent that determination, the record is not complete, as the Board recognized in vacating and remanding for additional findings of fact, including the taking of evidence if necessary, to make a proper weekly award under Sec. 10(c). If we had affirmed (instead of reversed) the Board's determination that Sec. 10(c) furnishes the proper measure of weekly disability compensation, the effect of our decision retaining appellate jurisdiction would be to remand (as the Board ordered on June 10, 1981, some eighteen months ago) to the Administrative Law Judge to calculate the weekly award, following which the employer (or the claimant) would be entitled once again to appeal this now-final order. Whether the majority had affirmed or reversed the Board's non-final order, however, in either event the majority's new exception rule builds into the administrative compensation-awarding processes an additional delay, in this case extending more than a year and a half (so far), by allowing an initial appeal as to the liability-standard, to be followed (quite possibly) by yet a second resort to the review process after, on remand, the ALJ fixes the rate of compensation and decides the subsidiary undecided issues, such as attorney's fees.
 
 
 62
 2. The employer sought judicial review of the Board's remand order, until now considered a non-reviewable non-final order. Assume that instead the parties had followed the previously accepted methodology, applying for judicial review only after a final order, and thus had complied with the remand and secured an expeditious administrative determination of unresolved issues, including the compensation, to be incorporated in a technically as well as actually final order. Upon judicial review from the true final order, the parties are faced with the possibility that, under the majority's new "pragmatic finality" exception, their failure to appeal the initial "final" order (determining only the standard of liability) forecloses subsequent review of the initial liability decision.[3] What must the parties do to avoid this possibility? Obviously, to avoid this possibility, a party must seek initial review of the initial Board remand-order, although it involves considerable additional appellate delays (here, eighteen months so far), and although the court may decide that, after all, the appeal is premature because the order is not "final" under the flexible finality rule envisioned by the majority's new exception.
 
 
 63
 3. If the previously accepted concept of "finality" for purposes of judicial review had been followed in this case, then on the single judicial review the courts would be concerned only with the merits of the litigation. (If a party appealed despite the accepted rule, the usual practice in this court would probably result in a dismissal by summary order of an administrative panel, since the rule of finality previously followed was certain and was easily administerable.) Under the new rule of appealability sanctioned by the majority, a new adjective issue of appealability is injected into every appeal from a Board remand-order or from an order by the Board following an unappealed Board remand-order.[4] Is or was the initial order "pragmatically" final? This will involve individual analysis in each case to determine whether where what the Board decided was a "legal standard" (instead of the factual application of a legal standard, a mixed law-fact question, for example) and whether the initial record was "complete" such that immediate judicial review of the initial order would add to the efficiency of disposition and would theoretically avoid the spectre of piecemeal judicial review. To replace the former certain definition of administrative finality, the majority substitutes a rule that requires case-by-case analysis in each individual appeal, that in many instances will result in the prolongation of judicial review by the frequent necessity of oral argument and collegiate interchange as to the variables now injected into this adjective issue of appealability per se--and one as to the application of which, I predict, reasonable appellate minds will differ. For the previously certain rule of "technical" as well as actual finality, the majority substitutes a flexible "pragmatic" finality rule of uncertain case-by-case application that must inevitably encourage precautionary interlocutory appeals, and their consequent delay, and that may in an appreciable number of cases delay the decision of the merits by injecting a complicated threshold adjective issue of appealability.
 
 
 64
 4. And what about the claimant (such as poor Roundtree, here), as the reviewing court entertains the initial appeal as to the legal standard of liability, despite a remand by the Board to calculate the weekly compensation. Here, back in June 1981, the Board vacated the provision of the order of the Administrative Law Judge awarding Roundtree a weekly compensation award, see Record Excerpts, p. 43, and remanded to that judge for him to make further findings and to take further evidence, if necessary, in order to calculate the proper weekly amount. We are informed that here the employer has continued to pay the claimant weekly compensation.
 
 
 65
 However, when the Board vacates the only order that requires an employer to pay weekly compensation, then--in the absence of a subsequent order by the administrative judge on the remand renewing the employer's obligation to pay weekly compensation--I would suppose that, as the Director in brief suggests, it is at least arguable whether the employer was obliged to continue to make compensation payments to its disabled employee before there was an administrative order fixing their actual amount. Should in such circumstances an employer terminate weekly compensation until an order as to its weekly amount is finally issued, the availability of interlocutory review of the Board's remand order (deciding the measure of liability, but remanding for calculation of the amount due) will add a considerable period of delay during which the disabled employee will receive no weekly compensation (here, more than eighteen months, so far), solely for the purpose of judicial review of the Board's interlocutory order. Only following conclusion of that interim lengthy judicial review of the measure-of-liability portion of the Board's remand-order, will the proceedings finally be remanded to the Administrative Law Judge to issue an order awarding weekly compensation in calculated amount--as would have occurred, absent interim judicial review, many months earlier. I cannot believe that either the purposes or intent of the compensation act are served by an interpretation of the judicially-reviewable "finality" provision of 33 U.S.C. Sec. 921(c), that will insert such additional interlocutory-review delays that may disrupt for an appreciable time the continued payment of weekly compensation to an admittedly disabled employee solely for the purpose of affording interlocutory judicial review.
 
 
 66
 I sympathize with my brothers of the majority in their commendable desire to decide now a central issue of this proceeding, since the appeal is already here, because in this case they view it to be more efficient to do so, under the particular issue and record presented to us. I share their general view that formal procedural rules should be applied in the light of their function, and that a practical rather than a technical construction is often suitable to advance the end purpose of a procedural rule. Here, however, the very purpose of the finality rule is thwarted by the practical construction accorded it; although it may advance the efficient decision of this particular case, the flexible rule of pragmatic finality adopted by the majority will impede the efficient and expeditious decisions of many, many appeals from administrative remand-orders in the future. At the same time, the newly created exception to finality replaces with large elements of uncertain administration the previously certain and efficient rule of finality as accorded to Board orders. The need for clear and easily administered rules as to the threshold adjective issue of reviewability overrides any values of flexible case-by-case administration. As has been stated in a related context:
 
 
 67
 Although well-established rules of appealability might at times cause an action to be determined unjustly, slowly, and expensively, they have nonetheless the great virtue of forestalling the delay, harassment, expense, and duplication that could result from multiple or ill-timed appeals. The great value of the final judgment rule may well be that it combines generally effective review with guides sufficiently clear to prevent most of the great waste that could result from protective appeals and litigation over appellate jurisdiction. Earnest pursuit of a "practical approach" could quickly destroy this accomplishment.
 
 
 68
 15 Wright, Miller, and Cooper, supra, Sec. 3913 at p. 523.
 
 
 69
 I therefore must respectfully dissent from the majority's opinion.
 
 
 
 [1]
 33 U.S.C. Sec. 921(c) provides in part:
 Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside.
 
 
 [2]
 Judge Tate, in his dissent, expresses his belief that the factual findings in the record may not be complete. Yet we find the record to contain clear and ample evidence of Roundtree's earnings history, the earnings records of his coworkers, and all other necessary information concerning the wages of Newpark's welders. The task of applying Sec. 10(b) to the existing record will be ministerial in nature. The case before us does not require us to determine whether the application of Sec. 10(c) would also be ministerial in nature, hence we need not speculate as to whether the BRB's order would be final, hence reviewable, if Sec. 10(c) rather than Sec. 10(b) were the proper formula
 
 
 [3]
 We recognize that some unresolved collateral issues may remain in the instant case as presented in this appeal. Roundtree, for example, has requested attorneys' fees stemming from the prior hearing before the ALJ. However, these issues are substantially unrelated to the heart of this appeal and therefore do not bar our jurisdiction to consider the central issue. "When attorney's fees are similar to costs or collateral to an action, a lack of determination as to the amount does not preclude the issuance of a final, appealable judgment on the merits." Holmes v. J. Ray McDermott & Co., Inc., 682 F.2d 1143, 1146 (5th Cir.1982) (citations omitted)
 
 
 [4]
 Section 10(a) of the Act, 33 U.S.C. Sec. 910(a), provides:
 If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.
 
 
 [5]
 Section 10(b) provides:
 If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.
 
 
 [6]
 The statute calls for comparison to "an employee of the same or most similar employment." See id. See also Andrew F. Mahony Co. v. Marshall, 56 F.2d 74 (9th Cir.1932)
 
 
 [7]
 Section 10(c) states:
 If either of the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.
 
 
 [1]
 Here, for instance, the majority decides that instead, Sec. 10(b) is the proper formula, so that more efficient non-piecemeal review is appropriate. However, had the majority decided that the Board correctly applied Sec. 10(c), the result of the majority rationale would permit (or require, see text below) two judicial reviews of the same award--the first (the present) as to the method of calculating the compensation benefits, and the second, if one of the parties disagreed as to the actual dollar rate of the actual award or as to the attorney's fees or other remaining issues in the case
 I may add that I entertain very serious reservations as to the correctness of the majority's conclusion that the Board improperly used Sec. 10(c) under the Board's determination that neither Sec. 10(a) nor Sec. 10(b) provided a reasonable and fair method of determining the "annual earning capacity", Sec. 10(c), of this particular employee, injured on the first day of his new employment after having left much more highly remunerative work of the same nature. Cf. also Sec. 8(h), defining "wage-earning capacity" and providing that "actual earnings" measure if they "fairly and reasonably represent his earning capacity."
 I read Sec. 10(c) as a Congressional grant of administrative discretion, subject to review only as an abuse, to determine the annual earning capacity of an injured employee where Sec. 10(a) and Sec. 10(b) do not reasonably and fairly result in a calculation of the annual earning capacity of the particular employee injured. See, to same effect, 1A Benedict on Admiralty, Sec. 74 at pp. 4-41 through 44 (7th ed. 1982). Thus, Sec. 10(a) and Sec. 10(b) were not legislatively intended to be a statutory straight jacket mechanically applied. In the present case, had the claimant Roundtree worked for the present employer (instead of for himself, doing the same type of work) for the preceding year, it would be obvious that his previous year's earning capacity and annual wages were greater than those of his present co-employees who had worked "in the same or in similar employment in the same or a neighboring place", Sec. 10(b), during the preceding year (upon which compensation is based, rather than on the increased pay such employees were now paid during the year of Roundtree's injury). In terms, Sec. 10(b) seems addressed to an injured employee who had not worked for the employer defendant "during substantially the whole of such [preceding] year," in which event his average annual wage is calculated as if he had worked the whole rather than only part of the year for that employer. However, since I do not believe we have jurisdiction to review this interlocutory order of the Board, I will comment no further as to the majority's ruling on the merits.
 
 
 [2]
 Particular requirements of an administrative review scheme may sometimes impose "special considerations" on the determination of finality that vary from the "classical jurisdictional requirements" applied to appeals from district courts. Sun Shipbuilding and Dry Dock Company v. Benefits Review Board, 535 F.2d 758, 760 (3d Cir.1976), see Weinberger v. Salfi, 426 U.S. 749, 764-67, 95 S.Ct. 2457, 2566-67, 45 L.Ed.2d 522 (1975). No such particular requirements or special considerations are relied upon or appear with regard to the present clearly delineated administrative and judicial review scheme
 
 
 [3]
 This type of problem is illustrated by Croker v. Boeing Co., 662 F.2d 975 (3d Cir.1981) (en banc). The district court entered judgment on the merits against the defendant in October 1979, leaving for determination only the amount of attorney's fees. In March 1980, the district court set the amount of attorney's fees, and the employees timely appealed within thirty days of the latter order. The defendant moved to dismiss the appeal by the plaintiffs as to certain merit-rulings in the October 1979 judgment. The defendant contended that the 1979 judgment was final, since it had decided all issues in the appeal. The court of appeal rejected this contention, holding that the 1979 judgment was not "final" under the general test that it did not terminate the litigation and leave nothing to be done to enforce the judgment
 The majority, rather unsuccessfully in my view, distinguishes this decision and numerous others to same effect by noting that the record at the time of the initial order did not contain all the factual matter necessary for the final determination of the amount of attorney's fees, so the initial order was not "final" and was not reviewable at that time. I am unable to see how the present record differs--even aside from the lack of complete evidence to decide the Sec. 10(c) issue. In the present case also, there was not a complete factual record necessary to fix the amount of attorney's fees due, an issue that the Board had remanded to the ALJ. This circumstance may indicate some of the difficulty and uncertainty in determining whether there is a "complete record" so as to permit a reviewing court to consider the order under review as "final".
 Perhaps some of the obvious possibilities of injustice and the necessity for precautionary appeal could be avoided by holding that, when an appeal is perfected, the order may be pragmatically "final" enough to be reviewable, but that a failure to appeal at that time will not preclude subsequent review of the technically (and actually) "final" order. However, such flexible interpretation would thwart the purposes of the finality concept, aside from raising fundamental issues of judicial disregard of the legislative final-order basis of appellate jurisdiction.
 
 
 [4]
 See note 3 supra