**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEALY TIBBITTS BUILDERS, INC.;
JOHN M. MANNERING,
　　　　　　　*Petitioners,*

　　　　　　v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS;
DARLETTE MAUMAU (WIDOW OF
FINEFEUIAKI MAUMAU); SHELLY
DAGGET (MOTHER OF SALESI AND
MAIKA MAUMAU); HAWAII
EMPLOYERS' MUTUAL INSURANCE
COMPANY,
　　　　　　　*Respondents.*

No. 04-70575

BRB Nos.
03-239
03-239A
03-239B

OPINION

On Petition for Review of Orders of the
Department of Labor Benefits Review Board

Argued and Submitted
February 15, 2006—San Francisco, California

Filed April 14, 2006

Before: Cynthia Holcomb Hall, Barry G. Silverman, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Silverman

## COUNSEL

Paul A. Schraff, Dwyer Schraff Meyer Jossem & Bushnell, Honolulu, Hawaii; and Christopher J. Field, Field Womack & Kawczynski, LLC, South Amboy, New Jersey, for the petitioners.

Howard M. Radzely, Solicitor of Labor; Donald S. Shire, Associate Solicitor; Mark A. Reinhalter, Counsel for Longshore; and Barry H. Joyner, U.S. Department of Labor Office of the Solicitor, Washington, D.C.; and Preston Easley, San Pedro, California, for the respondents.

## OPINION

SILVERMAN, Circuit Judge:

The Longshore and Harbor Workers' Compensation Act does not cover "all those who breathe salt air," but neither is it limited to Popeye. The decedent in this case was killed near the water's edge while excavating a utility line trench, a job that was part of a project to renovate three submarine berths at Pearl Harbor. We hold today that the Benefits Review Board reasonably concluded that the decedent was a "harbor worker" covered by the Act even though his specific job was not uniquely maritime in nature.

### I. BACKGROUND

Berthing wharves are large, concrete decks that extend from shore over navigable waters, and are used to accommodate submarines and other vessels while they are in port.

Healy Tibbitts Builders, Inc. entered into a contract with the United States Navy to replace each 28-foot-long deck with a 50-foot-long deck, as measured from the land to the water's edge where the submarines dock. The contract required re-routing utility lines that provided power and communication capabilities to the old berths by digging trenches and installing a new underground concrete duct bank, along with several new manholes. This "main duct bank," which encases conduit through which the electrical and communication cables run, runs parallel to the shoreline at a variable distance of 40 to 75 feet from the water's edge.

The contract contemplated that the new utility lines would run from nearby electrical substations on the naval base (outside the construction area), through the main duct bank and to shore power mounds on the berths. Shore power mounds are large box-shaped receptacles that ships can plug into while in port. To accomplish this, the contract also required installation of "secondary feeders," which are additional duct banks that run off the main duct bank to the shore power mounds.

Healy Tibbitts subcontracted with John Mannering to build the main duct bank. According to the contract's terms, Mannering was to: (i) demolish existing duct banks and manholes; (ii) excavate for installation of new electrical and communication duct banks and manholes; (iii) install concrete for duct banks after ducts and rebar are installed by others; and (iv) restore surfaces by backfilling and compacting over duct banks and manholes.

Decedent Finefeuiaki Maumau was hired by Mannering and began work on the project sometime in May 2001. On the day in question, fifteen weeks into the project, his job was to dig a trench. Maumau died when a steel trench shield that supported the sidewalls of the excavated trench fell on him. Mannering completed its work on the project four weeks later.

Darlette Maumau, decedent's surviving spouse, and Shelly Dagget, the mother of his two children, sought benefits under

the Longshore and Harbor Workers' Compensation Act. The District Director of the Department of Labor's Office of Workers' Compensation Programs ("OWCP") referred this case to an Administrative Law Judge, who conducted an evidentiary hearing on May 23, 2002. In his decision, the ALJ relied on past decisions in which the Benefits Review Board had interpreted the Act to cover construction workers involved in the construction of a dock used to house a submarine repair facility and other maritime facilities. The ALJ concluded that it was irrelevant that Maumau's specific job duties did not involve the loading and unloading of ships or were not "inherently maritime" in nature.

The ALJ awarded $1,166.78 per week in benefits. The ALJ considered the fact that Maumau earned $17,501.76 on the submarine berths project, and would have earned an additional $4,667.14 had he been there the last four weeks of the job. The ALJ computed Maumau's average weekly wage by dividing $22,168.90 (the total he could have earned on the project) by 19 weeks, the duration of Mannering's work on the project.

The Benefits Review Board affirmed. In ruling that Maumau was a "harbor worker" covered by the Act, the Board held that the relevant inquiry was whether the project on which he was working was connected to the servicing of ships, as opposed to whether his specific job duties were of a uniquely maritime nature. The Board also concluded that Maumau "in all likelihood would have continued to work . . . at the same wage as he was earning at the time of his injury." Healy Tibbitts and Mannering petitioned for review.

## II.  ANALYSIS

[1] To qualify for benefits, an individual must be an "employee" as that term is defined in the Act.[1] The Act defines

---

[1]Whether someone is an "employee" under the Act — otherwise known as the "status test" — is independent of the "situs test," which determines

"employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3).

**[2]** The claimants do not assert that Maumau was a longshoreman, that he was engaged in longshoring operations, or that he was a ship repairman, shipbuilder or shipbreaker. Instead, the controversy in this case centers on the terms "maritime employment" and "harbor worker," both of which the Act leaves undefined.

### A. The Director's interpretation of "harbor worker" is reasonable and consistent with the Act's remedial purpose.

**[3]** The Director of the OWCP urges an interpretation of "harbor worker" that would extend coverage to any worker, like Maumau, directly engaged in the construction of a maritime facility, even if the worker's specific job duties are not maritime in nature. We accord "considerable weight" to the Director's interpretation of the Act, even when its interpretation is advanced in litigation. *See Mallott & Peterson v. Dir., OWCP*, 98 F.3d 1170, 1172 (9th Cir. 1996) ("This deference extends not only to regulations articulating the Director's interpretation, but also to litigating positions asserted by the Director in the course of administrative adjudications . . . ."). If the Act is "easily susceptible" to the Director's interpretation, we "need go no further." *Id*. (internal quotations omitted). The Act, as remedial legislation, "should be liberally

---

whether the employee was at a maritime location when injured. *See* 33 U.S.C. § 902(4) (situs includes navigable waters and "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel"). Petitioners concede that the "situs test" is met in this case.

construed." *Ramos v. Universal Dredging Corp.*, 653 F.2d 1353, 1358-59 (9th Cir. 1981) (courts should " 'take an expansive view' " of the Act's coverage (quoting *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 268 (1977))).

**[4]** We adopt the Director's interpretation of "harbor worker" because it is reasonable and consistent with the remedial purpose behind the Act. Significantly, it already has been held that the Act covers those who repair the equipment with which ships are loaded and unloaded. *See Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 47 (1989) ("[E]mployees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act."). We decline the invitation to interpret the term "employee" in a way that distinguishes between those who repair equipment used in the loading and unloading process and those who build the facilities at which that same process takes place. Both groups are essential to the loading and unloading of a ship, and many of the skills necessary to repair the equipment used in that process (e.g., welding, electrical) are no more maritime in nature than those necessary to build a facility like the submarine berths in this case. Indeed, a primary purpose behind the Act was to eliminate such arbitrary gaps in coverage. As the *Schwalb* Court explained:

> Prior to 1972, the Act applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship. Congress acted to obviate this anomaly: § 903(a) extended coverage to the area adjacent to the ship that is normally used for loading and unloading, but restricted the covered activity within that area to maritime employment.

*Id.* at 46.

We must also account for the fact that 33 U.S.C. § 902(3)(C) *excludes* from the Act's coverage those persons "employed by a marina and who are *not* engaged in construction, replacement, or expansion of such marina (except for routine maintenance)." (Emphasis added.) It follows, then, that those who *are* engaged in the construction of a marina are covered. The text of the statute clearly shows that Congress considered the construction of a maritime facility, like a marina, as fully within the scope of the Act.

**[5]** Deference to the Director's interpretation is further warranted in light of past Benefits Review Board decisions that have extended benefits to employees engaged in building a maritime facility, even though their specific job duties were not maritime in nature. *See Fleischmann v. Dir., OWCP*, 137 F.3d 131, 137 (2d Cir. 1998) ("While the [Board], as opposed to the Director, does not merit deference, the [Board]'s consistent decisions bear upon the reasonableness of the Director's interpretation." (citation omitted)). The Board in *Hawkins v. Reid Assocs.*, 26 B.R.B.S. 8, 1992 WL 152120 (1992), upheld an award of benefits to a heavy equipment operator who was working at a submarine repair facility under construction. The employee's principal task was "to dig trenches and pull up old pipes in preparation for the laying of the utility lines or heavy pipes under ground." 1992 WL 152120, at *1. That is strikingly similar to the work that Maumau performed in this case.

In *Stewart v. Brown & Root, Inc.*, 7 B.R.B.S. 356, 365 (1978), and *Joyner v. Brown & Root, Inc*., 7 B.R.B.S. 608, 611 (1978), the Board concluded that the term "harborworker" includes "at least those persons directly involved in the construction, repair, alteration or maintenance of harbor facilities." *In re Long*, 2004 WL 1217849, at *11 (B.R.B.S. May 4, 2004).[2] The employees in *Stewart* and *Joyner* were

---

[2] *In re Long* involved a carpenter who was injured while erecting scaffolding that enabled workers to repair a pipeline on a pier where crude oil

both engaged in building a dry dock, although neither's tasks were maritime in nature.[3]

**[6]** Although none of our sister circuits has passed on the precise issue before us, we are not breaking new ground. The Second Circuit also has deferred to the Director's interpretation of "harbor worker," concluding that its interpretation is reasonable and preserves the purposes behind the Act. *See Fleischmann*, 137 F.3d at 136 ("The Director's interpretation of the term 'harbor worker' to include marine construction workers should be accorded deference because the term 'harbor worker' is undefined and ambiguous, and because including marine construction workers within the meaning of 'harbor worker' is reasonable and preserves the purposes of the statute."). Admittedly, our case is a bit different — the employee in the Second Circuit case was a pile driver who installed a bulkhead at a pier threatened by erosion of an adjacent cliff, which entailed duties more maritime in nature than Maumau's. Nevertheless, we are persuaded by the court's approach: faced with two reasonable and conflicting interpretations, the Act should be interpreted to further its remedial purpose.

**[7]** Likewise, under the Fifth Circuit's rationale in *Hullinghorst Indus., Inc. v. Carroll*, 650 F.2d 750 (5th Cir. 1981), Maumau would be covered by the Act. In *Carroll*, the employee was erecting a scaffold beneath a pier so that others could repair a turntable, which is used in the loading and unloading of ships. *See id.* at 752-53. The Fifth Circuit upheld

---

was unloaded from ships. *See* 2004 WL 1217849, at *14-15. Citing the *Brown & Root* decisions, the Board upheld the award of benefits, concluding that it was "immaterial that Claimant was engaged in the use of a non-maritime skill (carpentry) on a maritime project." *Id.* at *14.

[3]One was a general excavation foreman overseeing the loading of sand at a reclaiming pit, and the other was a painter-sandblaster. *See Brown & Root, Inc. v. Joyner*, 607 F.2d 1087, 1089 (4th Cir. 1979) (affirming on other grounds without addressing Director's interpretation of "harbor worker").

coverage, not because Carroll was a marine construction worker, but because he was engaged in "maritime employment." *Id.* at 755-56 (the maintenance and repair of equipment *and* facilities "used in indisputably maritime activities lies within the scope of 'maritime employment' as that term is used in the Act"). We find it significant that the employee's specific job duties (erecting scaffolding), which were anything but maritime in nature, did not influence the decision.

### B. The Director's interpretation is consistent with precedent.

As they did before the ALJ and the Board, Petitioners argue that the Director's interpretation of "harbor worker" is foreclosed by Supreme Court precedent and our decisions applying that precedent. The Act's coverage, they argue, is limited to those individuals whose specific job duties have "a tangible connection to the 'traditional' maritime activities of ship repair and loading/unloading." We reject Petitioners' arguments.

**[8]** In *Herb's Welding, Inc. v. Gray*, 470 U.S. 414 (1985), the employee was injured while working on an offshore oil-drilling platform. That project had nothing to do with the loading, unloading, repairing or building of vessels. The Court held that the Act did not cover such employees "just because they are injured in an area adjoining navigable waters used for such activity." *Id.* at 424 (internal quotations omitted). "While 'maritime employment' is not limited to the occupations specifically mentioned in [the Act], neither can it be read to eliminate any requirement of a connection with the loading or construction of ships." *Id.* at 423-24 (footnote omitted).

**[9]** *Herb's Welding* addressed the scope of the term "maritime employment" in the Act. *See id.* It did not address the issue of how a worker qualifies for benefits under the Act as a "harbor worker." As a result, the Court had no occasion to

decide the precise issue raised in this case — whether a marine construction worker can qualify for benefits even if his specific job duties are not maritime in nature.

**[10]** The Supreme Court took a step toward answering that question in *Schwalb.* The Court there said that "*aside from the specified occupations*" within the Act, of which harbor worker is one,[4] "land-based activity occurring within [a proper situs] will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel." 493 U.S. at 45 (emphasis added). Thus, contrary to Petitioners' argument, the Supreme Court has not rejected the Director's interpretation of "harbor worker." Instead, it left the door open.

**[11]** Petitioners, though, argue that *McGray Construction Co. v. Director, OWCP*, 181 F.3d 1008 (9th Cir. 1999), shut that door. In *McGray Construction*, we held that the Act did not cover an individual working as a pile driver on a project to construct a pier-like structure that housed oil drilling machinery, but not ships. Citing *Herb's Welding*, we said that the Act was not meant to cover employees "who are not engaged in loading, unloading, repairing, or building a vessel." *Id.* at 1013 (internal quotations omitted):

> The Board's cases involving construction workers on piers have held that the work was not maritime *where the piers were not used to accommodate ships*. The [Director's] argument has no force in this case, because the Board's own case qualified "piers" with the phrase "used in the loading, unloading, repair or construction of ships," and the pier in this case was not so used.

*Id.* (footnote omitted) (emphasis added).

---

[4]The others are longshoreman, ship repairman, shipbuilder and shipbreaker. *See* 33 U.S.C. § 902(3).

**[12]** We disagree that *McGray Construction* overruled the Board's decisions in *Hawkins* and the *Brown & Root* cases. We did not suggest in any way that those decisions were wrongly decided. Indeed, they are consistent with *McGray Construction*. *Hawkins* and *Brown & Root* concerned so-called "ship-less piers," not piers that accommodate vessels. The most that can be said about *McGray Construction* is that it bars coverage for those workers who are constructing a marine facility that does *not* accommodate ships.

We are fully aware that the Act does not cover "all those who breathe salt air." *Herb's Welding*, 470 U.S. at 423. More-over, we agree with Petitioners that the specific job duties of some workers involved in the construction of a maritime facility may be so tangential as to exclude them from the Act's coverage. For instance, the Act generally excludes from coverage those employed exclusively to perform office work, and also suppliers, transporters and vendors who are tempo-rarily doing business on an employer's premises, if they are not engaged in the work normally performed by that employer. 33 U.S.C. § 902(3)(A) & (D).

But this is not such a case. Maumau was directly involved in the renovation of berths designed for ships — in this case, submarines. Any other interpretation of the Act would exclude coverage for most of the many trade workers who contribute to the building of a harbor or dock. Construction workers often have specific skills, and are typically responsi-ble for only one part of the overall structure. If, as Petitioners contend, the test were whether the subcontractor's immediate work product had a maritime purpose in and of itself, few if any workers on a marine construction project would ever qualify for benefits. To put it another way, a maritime facility is simply the sum of its parts.

Citing *Weyher/Livsey Constructors, Inc. v. Prevetire*, 27 F.3d 985 (4th Cir. 1994), Petitioners argue that the Act did not cover Maumau because the cables that run through the main

duct bank transmit power elsewhere on the base, not just to the berths. Prevetire was a pipe fitter working on a project to construct a power plant at a Navy shipyard. The Board awarded benefits, concluding that the power plant "was essential to the shipyard's operations, including shipbuilding and ship repair work, and thus [Prevetire's work was] 'maritime employment' under the Act." *Id.* at 987.

On appeal, the Fourth Circuit stated that "[t]he sole disputed issue is whether Prevetire, a shipyard power-plant construction worker, was a 'person engaged in maritime employment.' " *Id.* at 988-89. *Prevetire* has no bearing on this case because, unlike Maumau, Prevetire did not assert that he was a "harbor worker" involved in the construction of a maritime facility. Nor could he have — unlike submarine berths, a power plant is not a uniquely maritime structure.

**[13]** In sum, we hold that an interpretation of "harbor worker" that includes workers directly involved in the construction of a maritime facility, even if their specific job duties are not maritime in nature, is both reasonable and consistent with the Act's purpose. Thus, the Board did not err in awarding benefits.

## C.   Substantial evidence supports the ALJ's calculation of benefits.

Petitioners argue that the ALJ erred by approximating Maumau's future earnings based solely on the wages he earned on the submarine berths project. According to Petitioners, the ALJ failed to account for the fact that Mannering had no plans to employ Maumau after the project, that Maumau was not a full union member and did not have his heavy equipment operator's license, and that Maumau consistently reported losses for his residential rock wall business, which he ran from 1995 or 1996 until he began working on the project. Although claimants could have further developed the record

on this issue, there is substantial evidence to support the ALJ's award of $1,166.67 per week.

[14] Title 33 U.S.C. § 910 provides three alternative methods for determining an employee's average annual earnings, which serve as the basis for determining the "average weekly wage."[5] Under § 910, the ALJ bases the calculation of average annual earnings on: (a) the employee's earnings from the previous year, if the employee worked in the field in which he was injured for "substantially the whole of the year immediately preceding his injury"; (b) if (a) does not apply, the average daily wage of a similarly situated employee in the year preceding the employee's injury; or (c) if (a) or (b) "cannot reasonably and fairly be applied," a combination of factors, namely the employee's previous earnings in the job at which he was injured, his other employment, and previous earnings of similarly situated employees.[6]

[15] The parties stipulated that § 910(a) was inapplicable, and claimants submitted no evidence as to the wages of similarly situated employees, which is a prerequisite to using

---

[5]The average weekly wage of an employee is "one fifty-second part of his average annual earnings." 33 U.S.C. § 910(d)(1).

[6]"Average annual earnings" means: (i) under § 910(a), 300 times the employee's "average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker"; (ii) under § 910(b), "if a six-day worker . . . three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed"; or (iii) under § 910(c), "such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, . . . shall reasonably represent the annual earning capacity of the injured employee."

§ 910(b). Thus, the ALJ used § 910(c), which we have said is intended to approximate an employee's future earning capacity in light of his "ability, willingness and opportunity to work." *Palacios v. Campbell Indus.*, 633 F.2d 840, 843 (9th Cir. 1980) (internal quotations omitted). We uphold an ALJ's calculation under § 910(c) if it is "a fair and reasonable measure" of the employee's earning capacity at the time of his injury. *Sproull v. Dir., OWCP*, 86 F.3d 895, 899 (9th Cir. 1996).

[16] There was substantial evidence to support the ALJ's determination that Maumau's wages from the submarine berths project reflected his future earning capacity. *See Kalama Servs., Inc. v. Dir., OWCP*, 354 F.3d 1085, 1090 (9th Cir.) (court must ensure that Board properly reviewed ALJ's factual findings for substantial evidence), *cert. denied*, 543 U.S. 809 (2004). Maika Mataele, who worked with Maumau on the project and was familiar with the operating engineer's union, testified that Maumau had operated a 90-ton crane in 1993 or 1994 and 1998 or 1999, and that Maumau could also operate hydraulic equipment, backhoes, excavators and "just about any piece of construction equipment." Mataele further testified that with his skills, Maumau "would be in great demand" after joining the union, that Maumau was on track to become eligible to join the union and that Maumau had a "firm offer" to return to a heavy equipment company he had worked for in the early 1990's. Mannering testified that although he had not promised Maumau any employment after the project, Maumau "could have gone to the union . . . to seek other jobs" and that "there was no reason he would not have rehired [Maumau] for future similar work." The ALJ found this testimony credible, and Petitioners offer no reason why we should not defer to the ALJ's finding. *See Todd Pac. Shipyards Corp. v. Dir., OWCP*, 913 F.2d 1426, 1432 (9th Cir. 1990) ("Credibility determinations, of course, are within the ALJ's province, and we must give them great weight.").

Moreover, the ALJ did not err by using only Maumau's wages from his 13 weeks on the project to calculate benefits.

*See Nat'l Steel & Shipbuilding Co. v. Bonner*, 600 F.2d 1288, 1293 (9th Cir. 1979) (upholding award of benefits where ALJ calculated average annual earnings under § 910(c) by considering only wages employee earned in 13-week period before injury, even though she earned more than 50 percent less in her prior employment). In addition to those wages, the ALJ properly considered Maumau's earnings at previous jobs, *see Bonner*, 600 F.2d at 1292 (ALJ must consider employee's previous earnings in the job at which he was injured and either (i) previous earnings of similarly situated employees *or* (ii) his other employment), and the fact that the ALJ gave little or no weight to the latter is no basis for us to disturb his ruling, *see id.* ("If the factfinder actually chose to give little or no [w]eight to one of the two factors, . . . that decision would not be reversed so long as both were considered.").

**[17]** We previously have held that resort to § 910(c) was appropriate where "[t]here was no fair or reasonable way to apply the 'daily wage' formulas of 910(a) or 910(b) because no evidence was introduced which could clearly determine the claimant's average daily wage." *Todd Shipyards Corp. v. Dir., OWCP*, 545 F.2d 1176, 1179 (9th Cir. 1976). Our focus on the *introduction of* such evidence, as opposed to its *availability* in the first place, suggests that the claimants had every right to make the tactical decision to skip § 910(b) and proceed under § 910(c). Petitioners cite no case law to the contrary, nor did they offer evidence of similarly situated employees' wages in rebuttal.

**[18]** A closer look at the statutory scheme confirms that a claimant can choose to proceed under § 910(c) even if he could proceed under § 910(b). Congress authorized the ALJ to consider evidence of similarly situated employees' wages when calculating benefits under § 910(c). Indeed, it is one of only three factors that the ALJ properly can consider. If Petitioners' reading of the statute were correct, that factor would be rendered meaningless in every § 910(c) calculation because, according to Petitioners, a claimant can proceed to

§ 910(c) *only if* they cannot muster evidence of the wages that similarly situated employees earn. We do not believe that Congress intended such an irreconcilable conflict in the statute.

### III.   CONCLUSION

For the reasons set forth above, the petition for review is **DENIED**.